**Lonnie Earl RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. B14–83–719CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 28, 1984.

Discretionary Review Refused
March 27, 1985

Jimmy James, Houston, for appellant.

Calvin Hartmann, Houston, for appellee.

Before PRESSLER, ROBERTSON and ELLIS, JJ.

## OPINION

ROBERTSON, Justice.

Appellant was convicted of criminal solicitation to commit capital murder. The jury assessed punishment at 35 years confinement. Appellant brings four grounds of error concerning: (1) sufficiency of the evidence to corroborate accomplice testimony, (2) fundamentally defective jury charge, (3) variance between indictment and charge, and (4) defective instruction on extraneous offenses. We affirm.

The relevant evidence is (1) appellant and Hancock (accomplice) were neighbors, Hancock having moved into a trailer park across the street from appellant. Hancock actually came to know the appellant through Norman Harris (the victim) who was a neighbor of both Hancock and appellant. (2) Harris testified that he told appellant he was going to buy an icebox and stove for his wife's anniversary. Appellant offered to sell these items to Harris for $150. Harris bought the items but later suspected that the items were stolen. Harris called Terra Homes because he knew appellant worked there and thought the stove and refrigerator might have been stolen from there. Harris then called the Sheriff's Department and made a report concerning the items he purchased from appellant. Charges were filed against appellant and Harris was subpoenaed to appear on June 27, 1983, in the 228th District Court in Harris County as a witness in the case. (3) Hancock testified that he met appellant in March or April 1983 through the complainant, Harris; that in June he was seeing him "on a daily basis"; that on "half a dozen or so" occasions appellant asked him to "dispose" or kill Norman Harris "because he (appellant) wanted to make some money out of running dope and if he would be put in jail, he wouldn't be able to make that money and Norman Harris was the only one that could testify against him in a theft charge and he wanted him out of the way so he could process (sic) making this money, doing his dope dealing." Hancock further testified that appellant explained that Norman Harris had received stolen goods from him (appellant)—"I think it was a stove—refrigerator off of him", and that Harris had "turned him in (to the police) and he needs to get rid of him." He testified that appellant told him "[I]f you can get rid of Norman, we can make some good money, as far, as you know, running grass, dope, marijuana, and he says, you can make some good money, about $500 a week clear, and have a nice trailer, you know, and all, to put your family in", and "[I]f I were to get caught or killed in the process of it, that he would take care of my wife and kids, as far as moneywise." Concerning the actual attempt to kill Harris, Hancock testified that he and appellant were "stripping some wire" that day and appellant told him "[W]ell, this is a good time to do it. Court is getting close and this is a good time to get it done" and he replied "[W]ell, I guess so"; that appellant gave him $50 and dropped him off close to Harris' house. He testified that he went to Harris' house, "said hello to Norman and his wife and asked Norman if he would go out and have a few drinks with me and he said sure." After having several drinks and getting some beer and wine to go he decided to "try to get him off to a secluded spot so I told him there was a place on down near the river, Channelview. I told him there was a bar down there, which there wasn't one. So we got on down there and I said, well, I had to go to the bathroom, so he stopped the truck and we both

got out and I said in my head, 'Well, if we're going to do it, might as well do it now.' So I pulled my knife out, walked around and I cut him." Finally, he testified that he then called appellant, who came and picked him up, that he informed appellant that he had "cut him" but "he ain't dead." He then related how he was arrested later that night, that he confessed to the deputy sheriff and later cooperated by making the telephone call to appellant so it could be recorded. (4) Harris testified: that Hancock came over to his house about 5 p.m. on June 23rd; that the two drove around in Harris' truck, stopped at several lounges, had some drinks and then stopped at the end of a dead end street to go to the bathroom; that while out of the truck "Hancock walked around the backside of the truck and come in from the backside of the truck and come in from the back part of me, where I couldn't see him in that direction, and slipped around and cut my throat;" that he "went down to the ground there for just a minute" but was able to get up, kicked Hancock and was then able to escape for help. After loosing consciousness he was taken to the hospital where he had surgery performed on his throat. (5) Hancock confessed to the police and agreed to assist them in their investigation. He agreed to call appellant on the telephone so the conversation could be taped. The recording of the call reflects that when appellant answered the telephone, the operator said: "collect from Hancock, will you pay for the call?" Appellant responded he would and immediately, the following occurred and the pertinent parts of the taped conversation are set out:

Hancock: Hello, hey.

Richardson: Hello, Billy.

Hancock: Hey, yeah. I tried to talk to you yesterday.

Richardson: My line is tapped.

Hancock: Huh?

Richardson: My line is tapped. They got a monitor on my line.

Hancock: O.K. Did you take care of what you said?

Richardson: I already gave her 50.

.    .    .    .    .

Hancock: Hey. Yeah, hey man. Let's go ahead and get this damn thing squared away, man. I gotta get the— I'm fixing to go to the damn federal pen. And I wanna know if my damn share of this is gonna be squared away before I get the hell out of Houston.

Richardson: There ain't no doubt about it. You know, I do what I can do.

Hancock: Well you're going, you're going to come across with more than 50 cause that ain't gonna make it along with them kids and Bonnie.

Richardson: I can only come across with what I got.

Hancock: Well you remember what we talked about and you said "Yeah, that'd be cool. You had it all together."

Richardson: Yes, But I gotta get the stuff to do it, don't I? And it ain't come in.

Hancock: Well, I tell you what, I know one damn thing, that she's going to have to get something.

Richardson: I already—

Hancock: She has to make at least 200, 300 dollars a week even to goddamn survive cause I ain't gonna be able to get nothing to her. I'm going to be up in the damn state penitentiary or some damn place for God knows how long. Hey, I pulled the little deal off. O.K. Fine. But if this deal ain't. We ain't got no bugs on it over here. I pulled it off and we made an agreement on it. Now I want the agreement to goddam go through. Cause I'm the one who's paying for it and now they're paying for it. Now it's all for something that I don't even know if it's gonna work out or not.

Richardson: Billy, I can only give what I got.

Hancock: Well, I need to know if they're taken care of and, and this little bit, 50 and 75, every two weeks or every week or something ain't gonna, ain't gonna, pay their rent and I don't want them

moving in over there, not with that shit going down with you guys, nuhuh, they've got to live in their own place. That's what the agreement was. Nobody said anything about put ... (unintelligible)

Richardson: Billy, I can only do what I got money to do with.

Hancock: I'm up here sweating my ass off about it, too.

Richardson: Billy, as soon as I get the money, they will get some money. As soon as I get the stuff moving. Do you understand what I'm saying? I've been waiting on it. You know that.

Hancock: I got some word up here. Norm * might not make it. You heard anything?

Richardson: No, I sure haven't.

Hancock: That's what they been pushing me up here. He ain't making it.

Richardson: Well, I talked to my attorney last night. And he said if the man was even in critical shape you'd have a $50,000 bail instead of a $10,000.

Hancock: Yeah.

Richardson: So he's gonna check into it but he can't do nothing until Monday.

In his first ground of error, appellant contends the trial court erred in overruling his motion for an instructed verdict of not guilty since "the evidence required to corroborate the accomplice witness' testimony was legally insufficient to corroborate both the solicitation itself and the appellant's intent that the accomplice act on the solicitation as required by Sec. 15.03(b); V.A.P. C." We disagree.

■ Subsection (b) of the criminal solicitation statute, TEX.PENAL CODE ANN. § 15.03 (Vernon 1974) under which appellant was indicted, provides that a person may not be convicted on the uncorroborated testimony of the person allegedly solicited *"and* unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation." We read this statute in conjunction with TEXAS CODE CRIM.PROC. ANN. Article 38.14 (the general statute on accomplice witness testimony) to require no more than that there must be evidence, other than the testimony of the accomplice "tending to connect the defendant with the offense committed" plus circumstances which strongly corroborate the solicitation itself (as testified to by the accomplice) and that the solicitation was made in earnest.

■ There can be no question that the accomplice witness Hancock made a complete case against appellant. While the corroborating evidence is far from overwhelming, we find from the following facts sufficient evidence tending to connect appellant to the commission of the offense:

1. appellant sold allegedly stolen goods to Harris

2. Harris reported appellant to the authorities

3. Harris had been summoned to appear at appellant's trial (to take place four days after the murder attempt)

4. Harris and Hancock were friends and there was no other reason for Hancock to attempt to kill Harris

5. appellant readily accepted Hancock's collect call

6. appellant immediately admonished Harris that his telephone was "tapped"

7. appellant continuously assured the accomplice during the telephone conversation that he would care for Hancock's wife and children when there was no apparent obligation to do so nor was there any other explanation given why he was was willing to do so

8. the portion of the telephone call concerning "Norm" and the fact that appellant had checked with his attorney regarding bail

We have *no* difficulty in finding that the above circumstances plus the circumstances under which Hancock attempted to kill Harris strongly corroborate the solicitation

---

* Note: The victim's name is Norman Harris.

itself and that appellant intended Hancock to act on the solicitation. Appellant's first ground of error is overruled.

■ In his second and third grounds of error, appellant contends the charge to the jury was fundamentally defective because it permitted a conviction upon a lesser culpable mental state than alleged in the indictment or as required by Section 15.-03(a). The complained of portion of the charge reads: "did intentionally or knowingly, with intent that capital murder be committed ..." The indictment alleged that appellant "with intent that capital murder be committed, request, command and attempt to induce DARRELL ETHER-IDGE HANCOCK to intentionally and knowingly cause the death...." Section 15.03(a) requires that the person act "with intent that a capital felony or felony of the first degree be committed...." Thus the statute requires specific intent. The charge itself required a finding of acting intentionally or knowingly in addition to a finding that appellant acted with intent that capital murder be committed. The "intentionally or knowingly" phrase was submitted as an additional element; the state's burden of proof was not reduced. *Johnson v. State,* 650 S.W.2d 784, 789 (Tex. Crim.App.1983). The second and third grounds of error are overruled.

■ In his fourth ground of error, appellant complains of the trial court submitting, over objection, a limiting instruction regarding testimony about an extraneous offense because there was no evidence that could support a jury's finding that appellant committed such extraneous offense. In the present case, apparently the trial court submitted the questioned charge on the theory that the state was entitled to prove the extraneous offense in order to establish a motive for appellant hiring Hancock to kill Harris. On direct examination, Hancock testified as follows:

Q: Do you believe that Mr. Richardson was serious about wanting to kill Mr. Norman Harris?

A: Yes, sir.

Q: And why did you believe he was serious about that?

A: Because he wanted to make some money out of running some dope and if he would be put in jail, he wouldn't be able to make that money and Norman Harris was the only one that could testify against him in a theft charge and he wanted him out of the way so he could process making this money, doing his dope dealing.

Q: Who told you that Norman Harris was the only one that could put him in jail?

A: Lonnie Richardson.

On cross-examination Hancock testified:

Q: You are leaving the jury with the impression, "I am out here just trying to feed my wife and kids and I got a job as an electrician, just barely getting by"? You were actually pushing marijuana, weren't you?

A: I wasn't an electrician. I didn't have a job as an electrician.

Q: Whatever you could pick up and push marijuana on the side?

A: For what little bit I did, yes. That was going to feeding and to the house.

On re-cross Hancock testified:

Q: In response to counsel's question, pushing marijuana, what was your involvement in that dealing of any marijuana?

A: To find somebody that wanted to buy it. He wrapped it up in eight-ounce bags.

Q: Who's he?

A: Lonnie.

Q: So while you were pushing marijuana, you were pushing it for this man, the Defendant Lonnie Richardson?

A: Yes, sir.

The content of the jury charge must be supported in the evidence. *Booker v. State,* 523 S.W.2d 413, 415 (Tex.Crim.App. 1975). As shown above there is evidence that appellant sold marijuana. The charge

instructed the jury to consider testimony (if any) relating to other offenses only if they believed beyond a reasonable doubt that such offenses were committed by the appellant and even then only for the purpose of establishing appellant's motive. We see no error in the limiting instruction of the charge. This ground of error is overruled.

The judgment is affirmed.

ELLIS, Justice, dissenting.

Finding myself in disagreement with the other members of the court, I would like to record my respectful dissent.

In his first ground of error, appellant contends the trial court erred in overruling his motion for an instructed verdict of not guilty since "the evidence required to corroborate the accomplice witness testimony was legally insufficient to corroborate both the solicitation itself and the appellant's intent that the accomplice act on the solicitation as required by Sec. 15.03(b) V.A.P. C." I agree.

The appellant was indicted for criminal solicitation under the authority of Tex.Penal Code Ann. § 15.03(a) (Vernon 1974). It states:

A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission.

Subsection (b) of the same statute instructs the prosecution and the court as to what is required for corroboration purposes if an attempt is made to base a conviction on testimony from an accomplice witness. It reads:

A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.

It is obvious that Section 15.03(b) is analogous to Tex.Code Crim.Proc.Ann. art. 38.-14 (Vernon 1974) which requires that a conviction based on accomplice witness testimony must contain corroborating evidence from an independent source that tends to connect a defendant to the crime. *Saunders v. State,* 572 S.W.2d 944 (Tex. Crim.App.1978). This statute is a general statute that applies to all such situations while § 15.03(b) is limited specifically to matters involving criminal solicitation. In order to understand the significance of the dictates of § 15.03(b), a statute with limited precedent, one must first analyze its forerunner, Article 38.14.

Article 38.14 requires that the corroborating evidence tend to connect a defendant to the crime and it is not sufficient if the evidence merely shows the commission of the offense. The evidence must go to the main issue of the crime. However, if the gravamen of the offense involves more than one essential element, then the corroborating evidence must connect the defendant to each of the essential elements. *Cagle v. State,* 505 S.W.2d 858 (Tex.Crim.App. 1974); *Fortenberry v. State,* 579 S.W.2d 482 (Tex.Crim.App.1979).

The test to determine sufficiency of the corroboration of the testimony from an accomplice witness is to eliminate the evidence of the accomplice from consideration and then examine evidence of other witnesses and from other sources to ascertain if there be inculpatory evidence of incriminating character which tends to connect the accused to commission of the offense. If there is such evidence, the corroboration is sufficient, otherwise it is not. *Cherb v. State,* 472 S.W.2d 273 (Tex.Crim.App.1971).

Understanding the abovementioned principles of Art. 38.14, it becomes easy to understand the dictates of § 15.03(b). A reading of § 15.03(b) indicates that the legislature incorporated these same principles into its mandates by requiring that the corroborating evidence that connects the primary actor to the crime be strongly cor-

roborative of both the solicitation itself and the actor's intent that the other person act on the solicitation. The Practice Commentary that precedes the Title 4 offenses interprets this subsection of the Code as requiring corroboration of both the making of the solicitation and that its making was in earnest.

This analysis makes sense because the gravamen of the offense of criminal solicitation is that one must request, command or attempt to induce another to engage in specific conduct and that this solicitation was made with the intent that a capital felony or first degree felony be committed. Therefore, these are the matters that must be corroborated. Further, it should be noted that the statute requires that the corroborating evidence must be strongly corroborative of both such matters. The use of the term "strongly" in the statute would indicate that the legislature intended for the corroborating evidence under § 15.03(b) to be more than evidence that just tends to connect the defendant to the crime as prescribed by Art. 38.14.

In the present case, Hancock testified that the appellant solicited him to kill Harris for money. The matters that must be corroborated are that appellant requested, commanded, or attempted to induce Hancock to kill Harris and that appellant intended that capital murder be committed. In order to test the sufficiency of this corroboration, we must completely disregard Hancock's testimony and examine the remaining evidence to determine if it meets the standards of § 15.03(b).

The State is relying on the tape recording to supply the necessary corroboration. Disregarding Hancock's testimony, we are left with the tape recorded conversation where appellant is discussing some form of activity in order to make money. There is only one slight reference to Harris made during the conversation. Appellant told Hancock that he had not heard about the condition of Harris and that if he was seriously injured that Hancock's bail would be $50,000 instead of $10,000, and that his attorney would check into the situation la-

ter. The tape contains nothing that is incriminating with regard to appellant soliciting Hancock to kill Harris for money. It corroborates nothing.

The fact that Harris was a potential witness against appellant in a criminal case does not prove that appellant hired Hancock to kill him. A motive might be a significant piece of corroborating evidence, but by itself it is not sufficient. The evidence considered in connection with the tape is still insufficient to corroborate testimony that appellant requested, commanded, or attempted to induce Hancock to kill Harris and that this solicitation was made with the intent that capital murder be committed.

Excluding Hancock's testimony and considering all the remaining evidence collectively, the strongly corroborative requirement of Section 15.03(b) is not met.

Accordingly, I would sustain appellant's first ground of error and reverse the judgment of the trial court. Double jeopardy law bars reprosecution of a criminal case in which the evidence at trial was insufficient as a matter of law. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).