**Lonnie Earl RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 850–84.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 9, 1985.

Jimmy James, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and James C. Brough and Chuck Noll, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of criminal solicitation to commit capital murder and was sentenced to 35 years at the Texas Department of Corrections.

The issue in the instant case is the Fourteenth Court of Appeals' interpretation of Tex.Penal Code Ann., Sec. 15.03(b) (Vernon's 1974) and its determination that the corroborating evidence presented by the State was sufficient. *Richardson v. Texas*, 681 S.W.2d 683 (Tex.App. 14 Dist.1984).

The record shows that appellant and the accomplice, Hancock, were neighbors. The victim, Norman Harris, told appellant that he wished to purchase a stove and refrigerator as anniversary presents for his wife. Appellant thereafter offered to sell Harris these items for $150. Harris suspected the items were stolen and, after confirming his suspicion, he contacted the sheriff's department. Charges were filed against appellant and Harris was subpoenaed to appear as a witness in the theft case.

In appellant's trial for criminal solicitation Hancock, the accomplice, testified that he met appellant in March or April of 1983 and thereafter saw him on a daily basis. Further, on "half a dozen or so" occasions appellant asked him to "dispose" of or kill Harris "because he wanted to make some money out of running dope and if he would be put in jail, he wouldn't be able to make that money and Norman Harris was the only one that could testify against him in a theft charge, and he wanted him out of the way so he could process (sic) making this money, doing his dope dealing."

Later appellant said to Hancock, "If you can get rid of Norman, we can make some good money, as far, as you know, running grass, dope, marijuana, and he says, you can make some good money, about $500 a week clear, and have a nice trailer, you know, and all, to put your family in" and "if I (Hancock) were to get caught or killed in the process of it, that he would take care of my wife and kids as far as moneywise."

About the killing Hancock testified that he and appellant were "stripping some wire" that day and appellant told him, "Well, this is a good time to do it. Court is getting close [the theft case was pending] and this is a good time to get it done" and Hancock replied, "Well, I guess so." At that point appellant gave him $50 and dropped him off close to Harris's house.

Hancock asked Harris out for drinks and afterward tried "to get him off to a secluded spot so I told him there was a place down near the river, Channelview. I told him there was a bar down there, which there wasn't one. So we got down there and I said, well, I had to go to the bathroom, so he stopped the truck and we both got out and I said in my head, 'Well, if we're going to do it, might as well do it now.' So I pulled my knife out, walked around and I cut him."

Afterwards Hancock called appellant, who came and picked him up, informing him that he had "cut him" but "he ain't dead."

Hancock then related the facts surrounding his arrest later that night and how he cooperated with the authorities by making a call to appellant so it could be recorded.

The recording of the call reflects that when appellant answered the telephone, the operator said, "Collect from Hancock, will you pay for the call?" Appellant re-

sponded that he would and immediately the following occurred in pertinent part:

Hancock: Hello, hey.

Appellant: Hello, Billy.

Hancock: Hey, yeah. I tried to talk to you yesterday.

Appellant: My line is tapped.

Hancock: Huh?

Appellant: My line is tapped. They got a monitor on my line.

Hancock: O.K. Did you take care of what you said?

Appellant: I already gave her fifty.

Hancock: Huh?

Appellant: I worked Jimmy yesterday and seen that Bonnie got 50—dollars you know.

Hancock: Oh, is that gonna, that gonna be the end of it or you gonna see is she's gonna get more?

Appellant: As soon as the other stuff comes through, it will be taken care of.

Hancock: Uh huh, cause like I say, I'm up here sweating this thing out and I ain't talked to nobody yet. And I don't want to talk to nobody. I just want to make sure everything's taken care of on that end.

  *  *  *  *  *  *

Hancock: Hey, yeah, hey man. Let's go ahead and get this damn thing squared away, man. I gotta get the, I'm fixing to go to the damn federal pen. And I wanna know if my damn share of this is gonna be squared away before I get the hell out of Houston.

Appellant: There ain't no doubt about it. You know, I do what I can do.

Hancock: Well you're going, you're going to come across with more than 50 cause that ain't gonna make it along with them kids and Bonnie.

Appellant: I can only come across with what I got.

Hancock: Well, you remember what we talked about and you said 'Yeah that'd be cool. You had it all together.'?

Appellant: Yes, but I gotta get the stuff to do it, don't I? And it ain't come in.

Hancock: Well, I tell ya what, I know one damn thing, that she's going to have to get something.

Appellant: I already ...

Hancock: She has to make at least 200, 300 dollars a week even to goddamn survive cause I ain't gonna be able to get nothing to her. I'm gonna be up in the damn state penitentiary or some damn place for God knows how long. Hey, I pulled a little deal off. O.K. Fine But if this deal ain't. We ain't got no bugs on it over here. I pulled it off and we made an agreement on it. Now I want the agreement to goddamn go through. Cause I'm the one who's paying for it and now they're paying for it. Now it's all for something that I don't even know if it's gonna work out or not.

Appellant: Billy, I can only give what I got.

Hancock: Well, I need to know if they're taken care of, and this little bit, 50 and 75, every two weeks or every week or something ain't gonna, ain't gonna, pay their rent and I don't want them moving in over there, not with that shit going down with you guys, nuhuh, they've got to live in their own place. That's what the agreement was. Nobody said anything about put ... (unintelligible).

Appellant: Billy, I can only do what I got money to do with.

Hancock: I'm up here sweating my ass off about it, too.

Appellant: Billy, as soon as I get the money, they will get some money. As soon as I get the stuff moving. Do you understand what I'm saying? I've been waiting on it. You know that.

Hancock: I got some word up here. Norm may not make it. You heard anything?

Appellant: No, I sure haven't.

Hancock: That's what they been pushing me up here. He ain't making it.

Appellant: Well, I talked to my attorney last night. And he said if the man was

even in critical shape you'd have a $50,000 bail instead of $10,000. ·

Hancock: Yeah.

Appellant: So, he's gonna check into it but he can't do nothing until Monday.

Tex.Penal Code Ann., Sec. 15.03(b) reads:

A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.

■ This section is analogous to Art. 38.14, V.A.C.C.P. and should be read in conjunction with it. *Saunders v. State*, 572 S.W.2d 944 (Tex.Cr.App.1978). Art. 38.14 provides that a conviction may not be sustained upon the testimony of an accomplice unless it is corroborated by other testimony which tends to connect the defendant with the offense.

Reading Penal Code, Sec. 15.03(b) in conjunction with Art. 38.14, the corroboration in criminal solicitation cases must link the defendant to the crime at two separate stages. According to the language of 15.-03(b) the evidence must be "corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation."

Appellant argues that use of the word "strongly" in 15.03(b) suggests that a different standard should be applied, a standard more stringent than that used in Art. 38.14 cases. The practice commentary to 15.03 reads in relevant part,

Since solicitation criminalizes a communication that is likely to occur under circumstances of low visibility, subsection (b) requires more evidence than just the testimony of the person allegedly solicited. Furthermore, there must be circumstances corroborating both the making of the solicitation and that its making was in earnest.

Practice Commentary, V.T.C.A., Sec. 15.03 (Vernon's 1974).

This same consideration supports Art. 38.14. This does not indicate a different standard but only re-emphasizes the need for some additional safeguard. The additional safeguard provided by 15.03(b) is that the corroboration go to both the solicitation and the solicitor's intent.

■ The test used to evaluate such corroboration is to eliminate from consideration the accomplice testimony and then determine whether there is other incriminating evidence tending to connect the defendant with the crime. *Adams v. State*, 685 S.W.2d 661 (Tex.Cr.App.1985).

■ It is not necessary that the corroboration directly link the defendant with the crime or that it be sufficient in itself to establish guilt. *Shannon v. State*, 567 S.W.2d 510 (Tex.Cr.App.1978).

■ In determining the sufficiency of the corroboration, the court should consider the combined weight of the non-accomplice evidence even if it is entirely circumstantial. *Rice v. State*, 587 S.W.2d 689 (Tex.Cr.App.1979); *Jackson v. State*, 516 S.W.2d 167 (Tex.Cr.App.1974).

■ The facts found by the Court of Appeals which are listed below satisfy this standard:

1. Appellant sold allegedly stolen goods to Harris.

2. Harris reported the incident to the authorities.

3. Harris had been summoned to appear at appellant's theft trial which was to take place four days after the murder attempt.

4. Harris and Hancock were friends and no other hypothetical motive for the attempt was shown.

5. Appellant readily accepted Hancock's collect call.

6. Appellant immediately admonished Hancock that his telephone was "tapped."

7. Appellant continuously assured Hancock that he would take care of his wife and children when there was no apparent obligation to do so nor was

there any other explanation given why he was willing to do so.

8. Appellant had checked with his attorney concerning Hancock's situation when no apparent obligation to do so was shown.

9. The portion of the telephone call referring to "Norm."

Many of the listed facts support both the solicitation and the solicitor's intent. The fact that appellant was willing to financially aid Hancock's family and consult with a lawyer on his behalf suggest that, not only was there an agreement, but that the agreement was taken seriously by both parties. However, some of the facts are clearly more supportive of one stage. The facts concerning appellant's theft charge and Harris's actions with respect to it suggests the existence of an agreement. Further, the fact that Hancock and Harris were friends is also evidence of an agreement. Alternatively, the fact that appellant readily accepted Hancock's collect call and warned him of the monitor on his phone tends to show that the agreement made was taken seriously by appellant.

Weighing the cumulative effect of all the evidence we find the corroboration sufficient on both the solicitation itself and the solicitor's intent that it be carried out.

Accordingly, the judgments of the trial court and the court of appeals are affirmed.

TOM G. DAVIS, J., not participating.

CLINTON, Judge, dissenting.

The pertinent part of V.T.C.A. Penal Code, § 15.03(b), at issue here is underscored:

"A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited <u>and unless</u> the solicitation is made under <u>circumstances strongly</u> corroborative of both the <u>solicitation</u> itself and the actor's <u>intent</u> that the other person act on the solicitation." [1]

The Houston (14th) Court of Appeals read § 15.03(b) "in conjunction with" Article 38.14, V.A.C.C.P.—

"to require no more than that there must be evidence, other than the testimony of the accomplice 'tending to connect the defendant with the offense committed' *plus* circumstances which *strongly corroborate* the solicitation itself (as testified to by the accomplice) and that the solicitation was made in earnest."

*Richardson v. State*, 681 S.W.2d 683, 686 (Tex.App.—Houston (14th) 1984). That reading gives effect to the "unless" clause.

Now, the majority would have "plus" and "strongly corroborate" mean simply "some additional safeguard ... that the corroboration go to both the solicitation and the solicitor's intent." Draft opinion, p. 6. As if by magic it has made the qualifying term "strongly" disappear. As thus interpreted the clause now reads—

"and unless the solicitation is made under circumstances corroborative of both the solicitation itself and the actor's intent ..."

Since the two key elements of the offense are "solicitation itself" and solicitor's "intent," the latter being "the very heart of the offense," under Article 38.14 the special rule followed in cases such as *Fortenberry v. State*, 579 S.W.2d 482 (Tex.Cr. App.1979), is that the usual charge on accomplice witness testimony is "not always sufficient," and "in directing the minds of the jury as to the law" the charge must state "that the very basis of the offense charged must be corroborated." *Id.*, at 485–486. In its brief before this Court the State acknowledges verity of the special rule. Brief, pp. 7–8. That being the applicable rule under Article 38.14, the interpretation suggested in the majority opinion is not "some additional safeguard;" it renders § 15.03(b) wholly ineffective in accomplishing what the Legislature patently intended by the very language used. Even the court of appeals gave the clause more effect than is proposed today.

1. All emphasis is mine throughout unless otherwise indicated.

However, both the majority opinion and the court of appeals have overlooked another facet of § 15.03(b) which is most important: the requirement that it be shown "the solicitation is made *under circumstances strongly corroborative*" of the solicitation and of the solicitor's intent. It is that requirement that the second sentence in that portion of Practice Commentary (quoted in the majority opinion at page 6) interprets, *viz:*

> "*Furthermore*, there must be *circumstances corroborating* both the making of the solicitation and that its making was in earnest."

The requirement goes well beyond corroborating just the testimony of an accomplice witness by evidence "tending to connect the defendant with the offense [of criminal solicitation]," as provided in Article 38.14, supra.[2] In this kind of case, given the evidentiary requirements imposed by "unless" clause, the majority opinion errs in stating at page 6, "It is not necessary that the corroboration directly link the defendant with the crime ..." The essence of criminal solicitation consists of the solicitation with requisite intent, both of which the Legislature has provided shall be "strongly corroborated" by independently proved circumstances. Certainly corroboration must directly link an accused to those two critical elements of the offense.

The testimony of Harris relates his transaction with appellant, his reporting the matter to police and filing charges and the fact that he was subpoenaed to be a witness in the resultant case, and it corroborates the attempt on his life as told by Hancock. But it does not go beyond suggesting a motive to solicitation itself or an intent on the part of appellant that Hancock act on a solicitation. Without more Harris is only saying that Hancock tried to kill him by cutting his throat.

While there may be sufficient evidence to show that appellant had a motive to prevent Harris from testifying, the State necessarily must and obviously did rely on content of the recorded telephone conversation between Hancock and appellant to show the solicitation itself. Looking for "sufficient evidence tending to connect appellant to the commission of the offense," the court of appeals found four features of the conversation had probative value. *Richardson v. State,* supra, at 686. Their worth must be assayed in context of the personal relationship between Hancock and appellant, however.

As the court of appeals found, they were neighbors in a trailer park, and became acquainted in March or April; by June they were seeing each other "on a daily basis" and doing some work together. Indeed, Hancock admitted that in those days he was "pushing" marihuana for appellant in order to get money "going to feeding and to the house."[3]

That appellant "readily accepted Hancock's collect call" is consistent with their friendship and relationship. Admonishing Hancock that his phone was "tapped" was equally a caution not to talk about their "running grass, dope, marijuana [sic] [to] make some good money." To say that appellant "continuously assured" Hancock that "he would care for" wife and children of Hancock is to strain the meaning of "I can only come across with what I got" and

---

**2.** In this regard, the opinion of the court of appeals creates an ambiguity in saying "circumstances which strongly corroborate the solicitation itself (as testified to by the accomplice) ..." *Richardson,* supra, at 686. Inserting that language parenthetically may cause the clause to mean that such "circumstances" are those "as testified to by the accomplice;" on the other hand, what may be intended is "the solicitation itself as recounted by the accomplice." Since the legislative intent was to require "more evidence than just the testimony of the person allegedly solicited," the ambiguity should be re-

solved in favor of the latter interpretation, thereby necessitating independent proof of those "circumstances."

**3.** One ellipsis in its account of their telephone conversation masks a statement by appellant to Hancock revealing a dark side in their relationship, *viz:*

> "I'm supposed to have that stuff this afternoon and *your people* have already spoken for three quarters, which I will give Bonnie seventy five as soon as I get something to deliver."

similar conditionally couched responses by appellant nearly every time Hancock mentioned his wife and children. As to the "Norm" portion, it was Hancock who interjected that party into the conversation. That appellant had talked with his own attorney about prospective amount of bail for Hancock is, again, consistent with their personal relationship.

In short, the content of their telephone conversation does not demonstrate "circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation," as required by § 15.03(b).

I respectfully dissent.

TEAGUE and MILLER, JJ., join.