In The


 

Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-243 CR


NO. 09-04-244 CR


____________________



MATTHEW DILLON WHITMIRE, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 75th Judicial District Court


Liberty County, Texas


Trial Court Nos. 24,624 and 24,625






MEMORANDUM OPINION


 A jury convicted Whitmire of criminal conspiracy to commit capital murder and
criminal solicitation to commit capital murder. The jury assessed punishment at life
imprisonment for each offense. In four issues, Whitmire contends the evidence was
factually and legally insufficient. Based on our review of the record as detailed below, we
conclude the evidence is sufficient to support the jury's verdict. The judgment is affirmed.

Standards of Review


 In reviewing issues of legal sufficiency, an appellate court views the evidence in the
light most favorable to the verdict to determine whether a rational fact finder could have
found each element of the offense beyond a reasonable doubt. Swearingen v. State, 101
S.W.3d 89, 95 (Tex. Crim. App. 2003). In Zuniga v. State, 144 S.W.3d 477, 484-85
(Tex. Crim. App. 2004), the Court of Criminal Appeals phrased the standard for a factual
sufficiency review as follows: 

 Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt? However, there are two
ways in which the evidence may be insufficient. First, when considered by
itself, evidence supporting the verdict may be too weak to support the
finding of guilt beyond a reasonable doubt. Second, there may be both
evidence supporting the verdict and evidence contrary to the verdict. 
Weighing all the evidence under this balancing scale, the contrary evidence
may be strong enough that the beyond-a-reasonable-doubt standard could not
have been met, so the guilty verdict should not stand. This standard
acknowledges that evidence of guilt can "preponderate" in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt. Stated another way, evidence supporting guilt can
"outweigh" the contrary proof and still be factually insufficient under a
beyond-a-reasonable-doubt standard. 


An appellate court "must give due deference to the fact finder's determinations concerning
the weight and credibility of the evidence. . . ." Swearingen, 101 S.W.3d at 97. It is the
sole province of the jury to determine the credibility of witnesses and to weigh
contradictory testimony. Cain v. State, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997).

Trooper Brian Nichols


 While on patrol, Trooper Nichols decided to stop a black Dodge dually for a
moving violation. The truck initially appeared to be stopping, but a high-speed chase
ultimately ensued. The suspect's vehicle struck another police officer at a roadblock.

 The suspect eventually jumped from the truck, and Trooper Nichols pursued him
into a wooded area. Trooper Nichols saw the suspect's face once or twice when the
suspect turned and looked over his shoulder, but he eventually lost sight of the suspect in
dense woods and underbrush.

 When Trooper Nichols returned to the suspect's truck, he found a billfold
containing Whitmire's driver's license. Trooper Nichols showed the driver's license to
other investigating officers and identified Whitmire as the suspect. Whitmire was later
apprehended in a trailer inside a hunting club.

 After being notified Whitmire had been caught, Trooper Nichols took custody of
Whitmire, and transported him to the Liberty County Correctional Facility. When they
arrived at the jail, Whitmire refused to stand near the book-in desk. Trooper Nichols
testified he grasped Whitmire's shirt and told him to follow instructions. Whitmire was
later placed in the same tank as Michael Swisher. 



Michael Swisher


 Swisher testified Whitmire told him he had an altercation with Trooper Nichols at
the jail, during which Trooper Nichols grabbed Whitmire's sleeve and pulled him onto a
desk. Whitmire told Swisher he then hit Trooper Nichols's chest. Whitmire said he hated
Trooper Nichols because he believed Trooper Nichols was "out to get him" and was
fabricating a report against him to keep him in jail. 

 Whitmire asked Swisher how much it would cost to have a cop killed and whether
he knew anyone who would be willing to do it. Swisher testified Whitmire mentioned
Trooper Brian Nichols by name. Whitmire told Swisher that Trooper Nichols was the only
thing keeping him in jail, and he had "to have him dead." Whitmire offered four cases of
hand grenades and a sniper rifle as compensation for the proposed murder. Whitmire told
Swisher the hand grenades and rifle were in Dallas. Swisher told Whitmire the grenades
and rifle would not do him any good in Dallas, and Swisher testified Whitmire's response
was 

 that if I would just get this done he would pay anything for it, he would sign
over anything, promise anything in the world, did not matter what it was. 
That he gave his word. When the job was done he would get out, go straight
to Dallas with whoever it was that did this killing for him, he would take
them to Dallas and retrieve the grenades and sniper rifle, and there would be
plenty . . . more if they wanted it.

Swisher instructed his wife, Judy, to contact an ATF agent right away, and Judy contacted
the authorities. Swisher testified 

 I was convinced . . . he was serious. And I'm also convinced that he had
other connections to make this happen. . . . I was just the . . . most
convenient. And . . . he felt comfortable with me. I felt like I could contain
it so an officer wouldn't end up killed.


Swisher stated he discussed the matter with Whitmire "[e]very single day," and Whitmire
talked about where Trooper Nichols lived. After Swisher met with the investigating
officers, he told Whitmire he would try to help him find someone to kill Trooper Nichols. 
Swisher testified:

 And he convinced me at that time that he was dead serious. He wanted to
meet whoever. He'd look them dead in the eyes in the visitation room
himself and convince them that he wanted this officer killed. At any cost.


 Swisher testified Whitmire told him he wanted to conduct all communications 
through his wife, Lisa. Swisher told Whitmire he would put him in contact with Swisher's
"brother" from Dallas who "kills people for a living." Swisher testified Lisa then met
Special ATF Agent Alan Futvoye, who was posing as the hit man, and Lisa, Judy, and
Agent Futvoye visited the jail the next morning. During the visit, Whitmire spoke to
Agent Futvoye, and Agent Futvoye then told Swisher "done deal." Swisher testified that
after the deal was consummated, Whitmire "was one happy fellow[.]" 

 Whitmire told Swisher that Agent Futvoye ("Big Al") asked for a down payment.
Swisher testified Whitmire was upset about the request because Whitmire could not gain
access to the grenades and rifle which were to serve as payment. Whitmire then suggested
to Lisa that his car be used as an alternate down payment. Whitmire told Swisher the
contract was made and the hit would take place. 

 Judy Swisher


 Judy said Michael Swisher asked her to tell Whitmire and Lisa that "Bro" would
be coming to meet Whitmire. Judy then took Lisa to meet "Bro" (Agent Futvoye). Judy
testified she and Lisa planned to take "Bro" to the jail the next day to meet Whitmire. 
Judy stated Whitmire wanted to make eye contact with "Bro" before he said anything. 
Lisa told Judy "Bro" wanted a down payment, so Whitmire offered some grenades from
"each box or something." Lisa told Judy she was supposed to meet "Bro" to discuss
payment. Judy testified that both Lisa and Whitmire told her Brian Nichols ". . . was the
only thing standing between [Whitmire] and freedom." Judy also testified she and Lisa
searched for Trooper Nichols's address, but they did not locate it. 

 Ranger Grover Huff


 Ranger Grover Huff was contacted regarding Swisher's report of a murder for hire
scheme. The investigating officers instructed Swisher to have Judy introduce Whitmire
to an undercover agent posing as a hit man. Swisher agreed to speak with Whitmire in the
jail while wearing a small body recorder. However, the resulting recording was of poor
quality. Ranger Huff subsequently met with other investigating officers, including Special
Agent Alan Futvoye, who agreed to act as the undercover operative. 

 Ranger Huff stated Swisher had requested consideration for both himself and his
wife in exchange for cooperating with the investigation. Ranger Huff testified he obtained
his information from Judy, Swisher, Agent Futvoye, and audio recordings. Ranger Huff
did not personally overhear Whitmire conspire to kill Trooper Nichols or solicit his murder
in "literal, specific terms." However, he opined the speakers' intent could not be
misunderstood.

 Special Agent Alan Futvoye


 Agent Alan Futvoye, a senior special agent with the Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF), testified he was contacted by officers investigating an
alleged murder for hire scheme. Agent Futvoye agreed to assume the role of the hit man,
and the officers arranged an undercover meeting with Judy and Lisa. During the meeting,
Agent Futvoye told Lisa he understood what he was being asked to do, but he did not
know the intended target's identity. Lisa then advised him the target was a DPS Trooper
who lived in Dayton and was assigned to Liberty County. Agent Futvoye testified he knew
the situation was a murder for hire "[b]ased upon information . . . from a number of
individuals that were participating in the investigation, information had been passed from
Mike Swisher to other law enforcement officials. I knew . . . that was what was being
requested of me."

 According to Agent Futvoye, Lisa told him Whitmire "had told her in a jail meeting
that he wanted this done." Lisa told Agent Futvoye that Whitmire 

 gestured with a knife edge of his hand across his throat . . . and . . . she said
who? The one who put you here? And he said yes. That's what she
described to me. So if there was any question in my mind as to why we
were meeting there that alleviated it for me. 

Agent Futvoye carried a digital audio recorder during the meeting. 

 Agent Futvoye and Lisa later discussed traveling to the jail to meet with Whitmire. 
Lisa told Agent Futvoye that Whitmire had instructed her to offer four cases of hand
grenades and a military sniper rifle as payment. Agent Futvoye recorded the ensuing
meeting at the jail. After entering the visitation area, Agent Futvoye and Whitmire made
eye contact. Agent Futvoye testified Swisher "bumped Matthew Whitmire and said 'this
is my Bro. I told you he'd be here.'. . . Matthew Whitmire appeared . . . and looked at
me again. And we acknowledged each other." During Agent Futvoye's conversation with
Whitmire at the jail, Whitmire said, "whatever [Lisa] tells you or whatever she says is
coming from me." Whitmire asked Agent Futvoye whether he knew what "spoons" were,
and he promised Agent Futvoye "two cases." Agent Futvoye testified "spoons" meant
grenades. After the meeting, Agent Futvoye reviewed the recording and found it to be of
poor quality.

 Agent Futvoye next met Lisa at Waffle House and recorded the meeting. Agent
Futvoye testified that Lisa said she wanted something to happen to Trooper Nichols, but
she didn't know whether he had a family. Lisa also said Whitmire was the only one who
could obtain the grenades and rifle. Lisa acknowledged she understood Agent Futvoye
needed a down payment. Whitmire called Agent Futvoye later that day, and Agent
Futvoye told him he would accept two or three grenades ("spoons") and the rifle as a down
payment, but Whitmire said he could not obtain them until he was released from jail. 

 Later that day, Lisa called Agent Futvoye. Although Agent Futvoye again recorded
the conversation, only his side of the conversation was recorded due to equipment
problems. Lisa told Agent Futvoye that Whitmire was upset because he could not
immediately provide the grenades and rifle, and she offered a car as the down payment. 
The next day, Agent Futvoye asked Lisa to obtain the car keys and to tell him the location
of the vehicle. Agent Futvoye and Lisa also discussed where Trooper Nichols lived. Lisa
told Agent Futvoye she previously searched with Judy Swisher, but they did not find
Trooper Nichols's patrol car. Lisa said she understood Agent Futvoye would begin taking
action to fulfill the contract and said "be careful."

 Agent Futvoye subsequently received another call from Whitmire. Agent Futvoye
also recorded this conversation. Agent Futvoye told Whitmire he would accept the car as
the down payment, and he also told Whitmire all arrangements were complete and he
would proceed. Whitmire stated he understood and said, "good."

 Agent Futvoye stated it was readily apparent that Lisa Whitmire suffered from an
illness or disability, and Lisa mentioned having a bad memory. However, he also testified
"I think [Lisa] maintained a level of awareness throughout . . . the entire series of
meetings. . . ."

 Agent Futvoye admitted the recordings contained limited, cryptic, and unclear
language, and the recordings containing clearer language are inaudible. He testified
neither Lisa or Whitmire specifically said, "I want you to go kill Trooper Nichols," but
their words made their intention clear. Agent Futvoye stated criminals often speak in
code, and the "purposely vague" language used was the best he could obtain under the
circumstances. Agent Futvoye stated he was concerned about losing the trust of Lisa and
Whitmire if he used more explicit language, and he feared they would then hire someone
else to commit the murder. Agent Futvoye opined the intent of the meeting was clear

 based on the totality of what had happened previously and what [Whitmire]
said to me that day. And then it was further made clear by the continued
meetings between myself and his wife and his calls back to me.


 Agent Futvoye stated if Whitmire was using the term "spoons" to refer to drugs,
he was referring "to a quantity of measurement which I have never heard in relation to
drugs." He further explained that the fuse assembly of a hand grenade contains a part
referred to as a spoon.

The Recordings


 During a recorded conversation with Lisa at the jail, Whitmire stated, "It's G*d
d*mn Nichols." In a subsequent discussion, the following exchange occurred between
Whitmire and Lisa:


 [Whitmire]: Be nice if he, he took a vacation. . . .

 [Lisa]: Who?

 [Whitmire]: The deputy.

 . . .

 [Whitmire]: The trooper.

 [Lisa]: He probably hasn't. I wish he would.

 . . .

 [Lisa]: And get lost somewhere.

 . . .

 [Lisa]: Never to be found again.

 [Whitmire]: Mmm, mmm.


 During another recorded conversation, Whitmire told Lisa, "I need to know that .
. . address. That's it don't say nothing else. I need the physical address." Whitmire also
said, "I hate . . . having to do that . . . but . . . I got to try something. I ain't just gonna
lay here and take no f***ing." During a subsequent conversation, Whitmire again stated,
"I need to know [the] exact address." "You know what I'm talking about." "The only
other time you mention that is to that person. . . . That you met."

 Whitmire also told Lisa, "I'm not gonna do this over the phone. It's gonna have
to be face to face. If not, we're gonna just . . . go through you." The following exchange
then occurred:

 [Whitmire]: Did he hint to anything? Do you know what's going on?

 [Lisa]: I kinda do.

 [Whitmire]: Okay. The vacation we were talking about . . . that person
that we know, too bad he don't take a long vacation.


Whitmire later told Lisa, "Tell him I can't go over four cases right now[.]"

 During the first meeting between Judy, Lisa, and Agent Futvoye, Lisa told Agent
Futvoye a DPS trooper was involved, and she discussed where the trooper was stationed
and the location of his home. Lisa also said she told Whitmire not to talk on the jail
phones because conversations were recorded. Lisa told Agent Futvoye that Whitmire
instructed "me . . . to talk to you . . . and lay it out and I looked at him and said lay what
out and he [drug his hand across his throat]. I said okay. I said the one that got you? He
said yeah. . . ." 

 During the meeting at the Waffle House, Lisa said Whitmire would have to "go to
Dallas to get the stuff" for the down payment. Lisa also stated, "I . . . wouldn't mind
seeing Nichols . . . taken care of. . . ." Lisa said Whitmire intended to offer "three
grenades and the rifle. . ." as the down payment. Lisa told Agent Futvoye,

 when [Whitmire] starts talking about it up at the jail I just tell him I say, you
know don't say a word, keep your mouth shut. . . .[H]e told me . . . you're
my mouth you're my eyes, my ears. . . . [He] told me . . . the first thing I'm
doing when I get out of here is going to Dallas and you know why.


Lisa also said "I wouldn't mind something happening to this guy but I don't know if he's
married or got kids or whatever . . . so I don't want anything to happen to his family. 
They didn't do it. He did it." 

 During Agent Futvoye's telephone conversation with Whitmire, he told Whitmire,
"I'm looking for . . . 2 or 3 of those spoons and that . . . long part of what we talked
about." Whitmire responded he could not provide them because "ain't nobody gonna deal
with nobody else but me." The next day, Agent Futvoye talked with Lisa about obtaining
the car. The following additional discussion took place:

 [Futvoye]: [w]e're slick on the down payment wise. . . .[Whitmire's] just
got to understand that when this is done . . . he's gotta come
up with his end.

 [Lisa]: [H]e's gotta get out first. Now I'm wondering since they got
the attempted capital murder on him what they're gonna do.

 [Futvoye]: Yeah but you know it's like, it's like we talked about. This .
. . guy's the only guy . . . that can make a case on him[.]

 . . .


 [Lisa]: I mean the D.A.'s already taken . . . the case. . . .

 [Futvoye]: Well, I think . . . the other . . . things that are gonna happen
is gonna play heavy on that.


 During the final telephone conversation between Whitmire and Agent Futvoye,
Futvoye told him, "everything is slick. [A]fter y'all came up with that idea that suits me
fine. . . . [S]he told me . . . where the thing's supposed to be. Whitmire responded, "Well
there's a guy that . . . tells me it's out by the airport for sure. . . ." Futvoye told
Whitmire, "things are on, things are on the way now," and Whitmire responded, "Okay. 
Fine." 

Matthew Dillon Whitmire


 Whitmire testified he was arrested at a trailer in the woods, but he denied
involvement in the chase with Trooper Nichols. Whitmire testified, "I'm not guilty." 
Whitmire stated he first learned of the chase when he was taken into custody. Whitmire
testified that when Trooper Nichols brought him to the book-in area, he invoked his
constitutional right to remain silent and attempted to return to the holding tank, walking
past Trooper Nichols as he did so. Trooper Nichols grabbed him and "slung" him around
a desk, and Whitmire told him he would "beat [his] eyes closed" if he touched him again.

 Whitmire stated that Trooper Nichols later told him,"look, I'm fixing to go on a
vacation, I don't want to do all this paperwork, why don't you help me out. I know the
people you run with." Whitmire refused to discuss the matter, and Trooper Nichols then
called "the State boys" and told them,

 I've got a man sitting here that tried to - attempted capital murder of a police
officer. He run in a truck. He runs around with some people that do a lot
of drugs in here and the man that owned the truck is also wanted . . . for
supposedly robbing a bank.


 Whitmire stated that after the judge found probable cause did not exist, he believed
his cases would be dismissed. Trooper Nichols assisted with filing a "blue warrant"
against Whitmire for parole violations. Whitmire stated "nothing was happening" with the
warrant, and "I was starting to get a little antsy from sitting in jail all that time with no
charges."

 Whitmire testified he was smoking in the bathroom at the jail when he first met
Swisher. Whitmire stated Swisher's testimony that Whitmire had approached him was not
true. Whitmire denied discussing killing anyone with Swisher. Whitmire testifed, "I think
the whole thing was a set up. [Swisher] wanted out of jail." Whitmire testified that he
asked Swisher to introduce him to Agent Futvoye ("Bro") because he was told "Bro" was
a repo man, and he wanted "Bro" to retrieve his car, which had been stolen by a dope
dealer. Whitmire testified he needed the car returned

 because we were paying for it through Ford Motor Credit. Second of all,
I was not planning on being in jail, I had no charges, I was going to get out,
and I didn't want these guys tearing it up, using it to haul drugs in. . . .


Whitmire also testified, "[Futvoye] and I were going to be able to hook up. We had plans
to get in the dope game. . . . [T]hat's what I thought the whole thing was about." 

 Whitmire stated Swisher instructed him regarding how to speak to "Bro." Whitmire
denied knowledge of hand grenades, and he testified the term "spoons" came from
Swisher. Whitmire denied looking for Trooper Nichols's address, and he testified, "I sent
Lisa to find my car . . . I have no idea where that cop lives." Whitmire said he could not
explain the mention of "a DPS officer" and "hand grenades" on the recordings because
he "wasn't there." Whitmire denied mentioning hand grenades as a down payment, but
he admitted that he mentioned using the car to pay "Bro's" expenses. Whitmire stated he
offered a rifle because Swisher told him Bro was a gun collector. However, Whitmire said
the "spoons" and the gun did not relate to killing Trooper Nichols. 

 Whitmire testified he used the term "cases" in reference to a large quantity of
cocaine or speed. Whitmire said he "talked in this code that [Swisher] gave me."
Whitmire opined Swisher was "playing two sides of the board" by giving different
information to Agent Futvoye and Whitmire. Whitmire testified his mention of "vacation"
on the recordings referred to his belief that "[Trooper Nichols] was supposed to have been
taking [a vacation]." Whitmire said it was Lisa, not him, who mentioned a permanent
vacation. Whitmire admitted he hoped Trooper Nichols would be gone long enough to
allow him to get out of jail. Whitmire further testified, "we wanted [Troooper Nichols]
to leave. He wouldn't file the paperwork. If he was gone long enough maybe somebody
would forget about Matt Whitmire that was sitting in jail[.]" 

 Whitmire admitted he was angry with Trooper Nichols, but stated he had no reason
to harm Trooper Nichols because no charges were pending against him and he was only
in jail on a blue warrant. Whitmire testified he did not ask Agent Futvoye to kill Trooper
Nichols for him, nor did he ask Lisa to ask him to do so. Whitmire testified Lisa suffers
from multiple sclerosis and sometimes becomes confused. Whitmire stated, "[w]hen it was
bad and the lesions would grow on the brain is when she would have a hard time. You
would have to literally explain something to her like she was a two or three year old
child." Whitmire admitted the recordings sounded like Lisa discussed murder with Agent
Futvoye. Whitmire also admitted he believed his wife was guilty, but he testified he was
not guilty. Whitmire admitted speaking with Agent Futvoye about remuneration, but he
stated he was not talking about killing anyone. 

 Whitmire stated he filed a complaint regarding Trooper Nichols, and he told the
officer assigned to investigate the complaint that if Trooper Nichols touched him again, he
would try to break his jaw. He also told the officer he cursed Trooper Nichols and
accused him of being crooked. Whitmire also informed the officer that he told Trooper
Nichols, "if he was going to take his badge and gun off we could go . . . the whole way
and box[.]"

 Whitmire testified, "I asked [Lisa] to do some illegal things. But I did not ask her
to kill a cop. Did not ask her to kill Brian Nichols. . . . I did not have an agreement with
her about killing Officer Nichols." Whitmire testified he promised Agent Futvoye dope
("spoons") as compensation for retrieving the car and a rifle to cover his expenses.
Whitmire testified he had promised Agent Futvoye two eight balls of cocaine for retrieving
the car. Whitmire said he also used the term "spoon" because Swisher told him a spoon
equaled an eight ball of cocaine.

 According to Whitmire, "[a] case was supposed to be the keys. The keys is what
I was supposed to be moving for Bro. . . . I wasn't supposed to give him anything. I was
supposed to be getting [methamphetamine] from him." Whitmire testified the deal later
changed, and Agent Futvoye was to receive money from selling Whitmire's car on the
black market. Whitmire testified the price of the job later increased to "two keys" (two
kilos of cocaine). Whitmire stated he was to give Agent Futvoye "two keys" for retrieving
the car and "being let into their click, their militia."

 The Issues Raised on Appeal


 Section 15.03(a) of the Texas Penal Code states:

 (a) A person commits an offense if, with intent that a capital felony or
felony of the first degree be committed, he requests, commands, or
attempts to induce another to engage in specific conduct that, under
the circumstances surrounding his conduct as the actor believes them
to be, would constitute the felony or make the other a party to its
commission.


Tex. Pen. Code Ann. § 15.03 (a) (Vernon 2003). 

 Section 15.02 of the Texas Penal Code provides:

 (a) A person commits criminal conspiracy if, with intent that a felony be
committed:

 (1) he agrees with one or more persons that they or one or more
of them engage in conduct that would constitute the offense;
and

 (2) he or one or more of them performs an overt act in pursuance
of the agreement.

 (b) An agreement constituting a conspiracy may be inferred from the acts
of the parties.


Tex. Pen. Code Ann. § 15.02 (a),(b) (Vernon 2003); see also McCann v. State, 606
S.W.2d 897, 898 (Tex. Crim. App. 1980).

 In his first issue, Whitmire contends the evidence was legally insufficient to support
his conviction for criminal solicitation to commit capital murder. The offense of criminal
solicitation to commit capital murder is complete when a culpable request or inducement
is unilaterally presented. Majid v. State, 713 S.W.2d 405, 407 (Tex. App.--El Paso 1986,
pet. ref'd). A meeting of the minds is not required. Id. The evidence must establish the
defendant acted with the specific intent that capital murder be committed. Richardson v.
State, 681 S.W.2d 683, 687 (Tex. App.--Houston [14th Dist.] 1984), aff'd, 700 S.W.2d
591 (Tex. Crim. App. 1985).

 A person may not be convicted of criminal solicitation on the uncorroborated
testimony of the person allegedly solicited unless the solicitation is made under
circumstances strongly corroborative of both the solicitation and the actor's intent that the
other person act on the solicitation. Tex. Pen. Code Ann. § 15.03 (b) (Vernon 2003);
Ganesan v. State, 45 S.W.3d 197, 201 (Tex. App.--Austin 2001, pet. ref'd). The
corroboration requirement is analogous to the accomplice witness statute, and the same test
for evaluating the sufficiency of the corroboration applies. Id. (citing Richardson v. State,
700 S.W.2d 591, 594 (Tex. Crim. App. 1985)). However, corroboration is required
regardless of whether the person allegedly solicited is an accomplice witness. Varvaro v.
State, 772 S.W.2d 140, 143 (Tex. App.--Tyler 1988, pet. ref'd). The appellate court
eliminates the accomplice testimony from consideration and then determines whether there
is other incriminating evidence tending to connect the defendant with the offense. Adams
v. State, 685 S.W.2d 661, 665 (Tex. Crim. App. 1985); Richardson, 700 S.W.2d at 594. 
"It is not necessary that the corroboration directly link the defendant with the crime or that
it be sufficient in itself to establish guilt." Id.

 Agent Futvoye testified Lisa told him the target was a DPS Trooper whom Whitmire
had told her he wanted killed. Agent Futvoye also testified Lisa referred to the payment
of hand grenades and a sniper rifle. Agent Futvoye stated Whitmire said, "whatever [Lisa]
tells you . . . is coming from me." Agent Futvoye also stated Whitmire offered two cases
of "spoons" as payment. Agent Futvoye testified Whitmire acknowledged he understood
all arrangements for the contract were complete and said, "good."

 Swisher testified Whitmire asked him the price for having a cop killed and whether
he knew anyone who would do it. Swisher also testified Whitmire offered four cases of
hand grenades and a sniper rifle as compensation, and he later offered his car as an
alternative down payment. Swisher said Whitmire wanted to meet the hit man to convince
him he wanted Trooper Nichols killed at any cost. Swisher also testified Whitmire told
him the contract on Trooper Nichols's life had been made. 

 Judy Swisher testified Lisa told her "Bro" wanted a down payment, so Whitmire
had offered some grenades from "each box or something." Judy testified she and Lisa
searched for Trooper Nichols's address.

 The recordings reflect Whitmire apparently agreeing that Deputy Nichols should
take a long vacation. The recordings revealed that Whitmire asked Lisa for a physical
address and instructed her as to negotiating payment terms with Agent Futvoye. Lisa told
Agent Futvoye that Whitmire instructed "me . . . to talk to you . . . and lay it out and I
looked at him and said lay what out and he [gestured by dragging his hand across his
throat]. . . . I said the one that got you? He said yeah. . . ." The recordings contain
Whitmire indicating he understood and approved when Agent Futvoye told him, "things
are on the way now."

 The recordings and the testimony of Michael Swisher and Judy Swisher corroborate
Agent Futvoye's testimony. Viewing the record in the light most favorable to the verdict,
a rational jury could have concluded beyond a reasonable doubt that Whitmire was guilty
of criminal solicitation to commit capital murder. See Tex. Pen. Code Ann. § 15.03
(Vernon 2003). The evidence is legally sufficient to support the verdict. Whitmire's first
issue is overruled. 

 In his second issue, Whitmire argues the evidence is factually insufficient to support
his conviction for criminal solicitation to commit capital murder. It is the exclusive
province of the jury to assess the credibility of the witnesses and to weigh contradictory
testimony, as well as to resolve any conflicts or inconsistencies in the evidence. Cain, 958
S.W.2d at 408-09; see also Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979). 
Considering all of the evidence in a neutral light, the jury was rationally justified in finding
Whitmire guilty of criminal solicitation to commit capital murder beyond a reasonable
doubt. See Tex. Pen. Code Ann. § 15.03 (Vernon 2003). The evidence supporting the
verdict is not too weak, nor is the contrary evidence, including the direct testimony of
Whitmire, so strong that the burden of proof could not be met. The jury may have found
Whitmire's testimony incredible, including his testimony that he was not guilty though he
thought his wife may be; the evidence is factually sufficient to support the verdict. 
Whitmire's second issue is overruled.

 In his third and fourth issues, Whitmire contends the evidence is legally and
factually insufficient to support his conviction for criminal conspiracy to commit capital
murder. Agent Futvoye testified Lisa told him Whitmire told her he wanted a DPS
Trooper killed. The recordings also support this testimony. Both Lisa and Whitmire
discussed terms of payment with Agent Futvoye. There was also evidence Lisa and Judy
searched for Trooper Nichols's address at Whitmire's request. Furthermore, there was
evidence Whitmire wanted all communications conducted through Lisa, and he told Agent
Futvoye, "whatever [Lisa] tells you . . . is coming from me."

 Viewing the record in the light most favorable to the verdict, a rational jury could
have concluded beyond a reasonable doubt that Whitmire was guilty of criminal conspiracy
to commit capital murder. See Tex. Pen. Code Ann. § 15.02 (Vernon 2003). 
Considering all of the evidence in a neutral light, the jury was rationally justified in finding
proof of guilt of criminal conspiracy to commit capital murder beyond a reasonable doubt. 
See Tex. Pen. Code Ann. § 15.02 (Vernon 2003). The evidence supporting the verdict
is not too weak, nor is the contrary evidence, including the direct testimony of Whitmire,
so strong that the burden of proof could not be met. Whitmire's third and fourth issues
are overruled. The judgment of the trial court is affirmed.








 AFFIRMED. 

 

 _________________________________

 DAVID GAULTNEY

 Justice


Submitted on May 6, 2005

Opinion Delivered July 27, 2005

Do Not Publish


Before Gaultney, Kreger, and Horton, JJ.