Opinion issued March 5, 2009

 








In The

Court of Appeals

For The

First District of Texas






NO. 01-07-01016-CR

NO. 01-07-01018-CR







CHRISTOPHER COOLEY, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 179th District Court

Harris County, Texas

Trial Court Cause Nos. 1132548 & 1132549






MEMORANDUM OPINION


 A jury convicted appellant, Christopher Cooley, of two felony offenses, as
follows: attempt to commit capital murder by employing another to commit capital
murder for remuneration, in trial court Cause No. 1132548, this Court's Cause No.
01-07-01016-CR; and solicitation of capital murder for remuneration, in trial court
Cause No. 1132549, this Court's Cause No. 01-07-01018-CR. (1) The jury assessed
appellant's punishment at 55 years' confinement in each case, to run concurrently.
Appellant presents three points of error. He challenges the sufficiency of the
evidence to support his convictions and claims that sidebar remarks and leading
questions by the prosecutor were prejudicial and that the trial court erred by
permitting leading questions by the prosecutor. We affirm.

Background


 Charles Zubarik is the complaining witness and the intended victim of both
offenses. He and appellant were business partners who owned Genesis Aircraft
Support (Genesis), a company that provided unloading services for air freight. The
two men had met many years earlier while working for different air-freight
businesses, and they came to admire each other's talents. In 1997, Zubarik provided
appellant with a few thousand dollars to help him launch a new endeavor in Dallas. 
They worked together on that venture and eventually created Genesis. Zubarik lived
and worked in Dallas, and appellant lived and worked in Houston.

 In 2001, Zubarik invested $50,000 into Genesis. He acted as a "silent partner"
in the company until he was able to be more involved in management. Zubarik and
appellant ultimately agreed, verbally, that each would receive an annual salary of
$100,000. Appellant took a $150,000 salary, however. In addition, but unknown to
Zubarik, appellant paid his house loan out of Genesis funds. Each man also acquired
a $2 million insurance policy on the life of the other. (2)

 Zubarik acknowledged at trial that appellant was more responsible for the
company's day-to-day operations, but he also claimed that appellant thwarted his
efforts to take on more responsibilities. As time progressed, the men's disagreements
about management of the company increased. Zubarik's particular concern was that
the company was not being run efficiently. Though it generated nearly eight million
dollars of revenue per year, the company was not profitable, and appellant would
often claim that cash-flow problems prevented paying Zubarik his monthly salary.

 The evidence at trial showed that appellant's cash-flow problems resulted more
from his personal financial overreaching than from poor management of Genesis. 
Appellant was married, and his wife required costly treatment on a weekly basis for
a rheumatoid arthritis condition. Though the father of four sons, aged five through
12, including one with a medical condition that required expensive treatment,
appellant engaged in an extramarital affair with at least one woman in another state. 
Appellant also maintained a lake house and a boat, in addition to a house for his
family in Kingwood that had been appraised at $635,000. Zubarik did not know until
much later that an annual $60,000 of Genesis funds financed the house.

 In early 2005, appellant approached a Genesis employee, Celso Castillo, and
asked whether Castillo "knew anybody that [sic] could do something bad." Castillo
initially dismissed the remark, but appellant contacted him again. This time,
appellant was more specific and stated that he wanted to hire someone to commit a
murder. Appellant offered Castillo $25,000, and Castillo recruited a fellow
employee, Jorge Argueta, for the task. Appellant provided information about the plot
to commit the murder, but identified the victim only as an "associate." Castillo
eventually learned that Zubarik was the intended target. Appellant wanted the murder
to take place in Dallas, but Castillo refused. Weeks later, another Genesis employee
drove from Chicago with the $25,000 payoff. He gave the money to appellant, who
gave it to Castillo, and they agreed to conduct the murder in Houston and formulated
a plan. 

 The plan was for Zubarik to come from Dallas to Houston for a dinner meeting
with appellant at a Kingwood restaurant. Zubarik would be killed after he left the
restaurant. Castillo was to remain in the restaurant parking lot and would contact
Argueta by telephone when Zubarik began to drive away in his gold Lexus RX300. 
Appellant invited Zubarik to Houston on April 19, 2005 for the business dinner at a
Kingwood restaurant. 

 When Zubarik left the restaurant, appellant telephoned Castillo, who
telephoned Argueta, who was stationed in a car on a highway feeder along with
another individual. Castillo became frightened, however, and telephoned Argueta
again to call off the murder. Castillo instructed Argueta to claim that his gun had
malfunctioned. 

 Zubarik recalled at trial that the ostensible purpose of the April 19, 2005
meeting was to discuss a new business venture. But he and appellant neither
discussed nor decided any real business, though the dinner meeting lasted about 90
minutes. Zubarik remembered that appellant had insisted that Zubarik have dessert,
and that appellant had excused himself from the table before the meal ended. Zubarik
considered the meeting "a joke" and returned to his hotel. 

A. Attempted Murder

 The failed attempt angered appellant, who began to pressure Castillo to finish
the job. After more debate about where to conduct a similar crime, a plan similar to
the April 19 scheme emerged. This time appellant would meet Zubarik at a different
restaurant in the Kingwood area. This dinner meeting took place on May 2, 2005. 
Appellant again insisted that Zubarik get dessert. "Trucking people" were also
present at the dinner meeting, but Zubarik recalled that, again, the meeting
accomplished nothing. After leaving the restaurant, Zubarik drove onto Beltway 8,
heading east. As planned, appellant contacted Castillo when Zubarik left the
restaurant. Castillo then used a two-way radio to communicate with Argueta, who
also had a two-way radio and was positioned in a car across the highway with a third
person. 

 As Zubarik drove along the highway, he suddenly found himself surrounded
by flying glass. Though startled, he recalled hearing two loud noises before feeling
sudden and acute pain in his right arm. With his arm was "just hanging there" and 
the acute pain, Zubarik had to struggle to regain control of his vehicle. Yet, he
managed to accelerate and drive off the highway and into a Mobil station, where he
stumbled into the store area and collapsed. Photographs of Zubarik's vehicle showed
that the two shots were fired into the driver's side of his car, and photographs of the
car and the scene showed that he had lost considerable amounts of blood. In the
meantime, Argueta, who believed the murder had been accomplished, contacted
Castillo to tell him, "It's a done deal." Castillo contacted appellant and conveyed the
same message.

 With the assistance of a bystander at the Mobil station, Zubarik was able to
telephone his wife at their home in Dallas and told her to contact appellant. Zubarik
could identify his location only as a gas station and did not know the address, but
appellant nonetheless arrived at the Mobil station just minutes later. Zubarik recalled
that appellant appeared very pale and feared that appellant might faint and collapse
on top of him. Emergency personnel summoned to the station transported Zubarik
to a hospital, where he was treated for severe injury to his right hand and blood loss. 
Zubarik eventually required eight surgical treatments, in addition to continuing
treatment for a related staph infection. At the time of trial, Zubarik had only 55-60%
use of his hand. 

 Upset by the call about her husband, Zubarik's wife contacted a friend, who
immediately drove her from Dallas to Houston to see Zubarik. The two women went
to appellant's home and then followed him in his car as he drove to the hospital. 
When they arrived at the hospital, appellant approached Zubarik's wife before she
could get out of her car. At trial, Zubarik's wife testified that appellant leaned into
the car to speak with her, warned her that the police would want to speak with her,
and told her "it would be better" if she did not mention insurance policies. 

B. Solicitation of Capital Murder

 Angered about the failed plan to kill Zubarik, appellant confronted Castillo and
issued an ultimatum to "Do what you got to do to make it right." Appellant suggested
that Zubarik be killed in the hospital. When Castillo refused, appellant prodded him
repeatedly for the next few months about carrying out the murder.

 Zubarik told officers of the Harris County Sheriff's Department who were
investigating the incident that he did not see who had attacked him or the car from
which the shots came. He had no idea who his assailants might have been, though he
speculated a business controversy with an Illinois company could have prompted the
attempt on his life. Zubarik did question his two dinner meetings with appellant,
however, noting that they had not discussed any relevant business at either meeting. 
Zubarik considered appellant a friend, had not had any recent "negative signals" from
him, and did not want to think of him as the perpetrator. The Harris County Sheriff's
Department investigated the scene of the shooting and also investigated the Illinois
company, but did not develop any leads.

 About a year later, appellant contacted Castillo again about killing Zubarik, but
this time he increased the payoff to $30,000. Castillo contacted Argueta, who resisted
involvement at first, but later told Castillo that he had recruited "a homeboy" who
was willing to do the killing. Castillo did not immediately trust Argueta's recruit, but
nonetheless decided to proceed with the plan to use him as the hitman. Neither
Castillo nor Argueta realized that the recruit was working by then as an undercover
informant for the Houston Police Department (HPD). 

 Under the new plan, Zubarik would be murdered at a Genesis warehouse in
Dallas. After meeting with others to discuss the plot, a Genesis employee drove
Castillo and Argueta to Dallas in a Genesis company truck registered to appellant. 
While in Dallas, they planned to meet yet another man who would supply money and
a gun to carry out the killing. After viewing the area and the plan for the murder,
Castillo, Argueta, and the undercover informant met at a Dallas restaurant, where they
received money and the gun to be used for the murder. Castillo and Argueta agreed
to alert the hit man when Zubarik was en route to the warehouse. Castillo and
Argueta then returned to Houston to develop an alibi. Undercover officers had audio-videotaped the restaurant meeting in Dallas. 

 HPD had been monitoring many meetings and communications through
surveillance and undercover officers in both Dallas and Houston. In one incident,
they watched Castillo meet with the undercover informant in Houston and learned
after that meeting about the plan for Castillo to meet in Dallas so that the hitman (the
undercover informant) could become familiar with the plan and location and learn
that Zubarik was the intended victim. HPD officers then approached Zubarik at his
home, outlined the plot to kill him, and told him that appellant would soon attempt
to lure him to the Dallas warehouse. Police officers stayed at Zubarik's home for a
number of days and provided him with equipment to record any communications with
appellant.

 Appellant telephoned Zubarik five times about visiting the Dallas warehouse
as quickly as possible. Zubarik was able to record two of the conversations.
Appellant claimed that he had sent a package to the warehouse office and that the
package contained important documents about an IRS audit that required Zubarik's
signature or acknowledgment. (3) Zubarik managed to delay the trip to by claiming he
could not make the trip because of staph-infection complications with his arm injury. 
 Appellant persisted, however, and the package was eventually sent to the
Dallas warehouse. But, Zubarik never made the trip because police soon arrested
everyone involved in the plot. The package sent to the warehouse contained only a
CD; there were no documents. Zubarik later learned that appellant had purchased an
additional $2 million policy to insure Zubarik's life. 

C. The Trial

 At trial, Castillo testified about his role, appellant's role, and the role of the
other participants in committing the offenses. The evidence at trial included the
money, gun, and ammunition delivered at the restaurant meeting in Dallas and two
of the five recorded telephone conversations between appellant and Zubarik. When
appellant testified at trial, his marriage had ended, and Genesis was bankrupt. 
Appellant claims that another Genesis employee had fabricated the plots with
Castillo, Argueta, and others and had framed appellant. The evidence established that
Castillo and Argueta confessed to participating in both offenses, and that the shooter,
Adrian Beltran, confessed to participating in the attempted murder on April 19, 2005,
in which Argueta was the driver. The trial court's charge to the jury for each case
instructed the jury that Castillo was an accomplice as a matter of law.

Accomplice-Witness Testimony


 Appellant's first issue purports to challenge the legal and factual sufficiency
of the evidence to support his convictions. In support of his challenge, however, he
argues that the State did not sufficiently corroborate the testimony provided by the
accomplice-witnesses. Regarding his conviction for attempted solicitation of capital
murder for remuneration, appellant contends that the testimony of Castillo and the
informer lacked sufficient corroboration. For his attempted capital murder
conviction, appellant contends that Castillo's testimony lacked sufficient
corroboration. Appellant's contentions invoke two statutes whose terms govern
convictions when the State relies on accomplice-witness testimony. See Tex. Code
Crim. Proc. Ann. art. 38.14 (Vernon 2005) (general rule of accomplice-witness
testimony); Tex. Penal Code Ann. § 15.03(b) (Vernon 2003) (accomplice-witness
rule for criminal solicitation cases). 

A. Standard of Review 

 1. Statutory Sufficiency

 Addressing the accomplice-witness rule of article 38.14, the Court of Criminal
Appeals described the rule as "a statutorily imposed review" that "is not derived from
federal or state constitutional principles that define the legal and factual sufficiency
standards." Druery v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); see
Cathey v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999); Cao v. State, 183
S.W.3d 707, 710 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd) (citing Cathey,
992 S.W.2d at 462-63); cf., Long v. State, 245 S.W.3d 563, 569-70 (Tex.
App.--Houston [1st Dist.] 2007, no pet.); St. Julian v. State, 132 S.W.3d 512, 515-17
(Tex. App.--Houston [1st Dist.] 2004, pet. ref'd) (applying both statutory standards
and traditional sufficiency standards, given that appellants had challenged not only
sufficiency of non-accomplice testimony, but also sufficiency of evidence in general). 
 Appellant's challenges in this case focus on lack of corroboration of the
accomplice witnesses. In addition to his arguments under the statutory standards,
appellant asserts a conclusory challenge to the legal and factual sufficiency of the
evidence, but again focuses on the non-accomplice testimony and does not challenge
the evidence as a whole. Accordingly, we apply the sufficiency standard dictated by
the Legislature in enacting articles 38.14 of the Code of Criminal Procedure and
section 15.03 of the Penal Code. See Druery v. State, 225 S.W.3d at 498. 

 2. "Corroboration" Statutes

 Article 38.14 of the Code of Criminal Procedure provides that, "A conviction
cannot be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the offense." 
Tex. Code Crim. Proc. Ann. art. 38.14. 

 An additional statute governs testimony by an accomplice witness in a
criminal-solicitation case. (4)
 Pursuant to section 15.03(b) of the Penal Code, "A person
may not be convicted of criminal solicitation on the uncorroborated testimony of the
person allegedly solicited, unless the solicitation is made under circumstances
strongly corroborative of both the solicitation itself and the actor's intent that the
other person act on the solicitation. Tex. Penal Code Ann. § 15.03(b).

 3. Review is the Same under Either Statute

 In Richardson v. State, 700 S.W.2d 591, 594 (Tex. Crim. App. 1985), the Court
of Criminal Appeals rejected the petitioner's contention that the words "strongly
corroborative" in section 15.03(b) of the Penal Code imposed a more rigorous
standard for criminal-solicitation convictions than the standard imposed by the
general accomplice-witness statute, article 38.15 of the Code of Criminal Procedure. 
See Claxton v. State, 124 S.W.3d 761, 765 (Tex. App.--Houston [1st Dist.] 2003, pet.
denied) (citing Richardson, 700 S.W.2d at 594). As Richardson explained, section
15.03(b) does not impose a more stringent standard than article 38.15, but is
"analogous" to it and "should be read in conjunction with it." Id. On construing the
two statutes together, the Court of Criminal Appeals interpreted the words "strongly
corroborative" in section 15.03(b) as merely re-emphasizing the need for "some
additional safeguard." Id.; see Claxton, 124 S.W.3d at 765. Section 15.03 provides
that additional safeguard by requiring that the requisite corroboration "go to both the
solicitation and the solicitor's intent." Id. (citing Practice Commentary to Tex.
Penal Code Ann. § 15.03).

 For both offenses, therefore, we apply the well-settled standard of review,
which requires that evaluate the sufficiency of corroboration evidence under the
accomplice-witness rule by first eliminating testimony of the accomplice from
consideration and then examining the remainder of the record for non-accomplice
witness evidence that "tends to connect the accused with the commission of the
crime." Malone v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting
Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)); see Long, 245
S.W.3d at 568. In criminal solicitation cases, this standard demands that the non-accomplice evidence tend to connect the accused, here appellant, with both the
solicitation and his intent. See Richardson, 700 S.W.2d at 594; Claxton, 124 S.W.3d
at 765. 

 In applying this standard, we view the evidence in the light that most favors the
jury's verdict. Brown v. State, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing
Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)); Claxton, 124 S.W.3d at
765. We consider the combined weight of the non-accomplice evidence, even if that
evidence is entirely circumstantial. Claxton, 124 S.W.3d at 765 (citing Saunders v.
State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). Corroborating evidence is
"incriminating" evidence that does not come from an accomplice witness. See
Claxton, 124 S.W.3d at 765. Corroborating evidence that shows only that the offense
was committed is not sufficient. Tex. Code Crim. Proc. Ann. art. 38.14, 38.141(b);
Castillo v. State, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). Yet, the
corroborating, i.e., non-accomplice, evidence need not be sufficient, by itself, to
establish that the accused is guilty beyond a reasonable doubt. Long, 245 S.W.3d at
568 (citing Castillo, 221 S.W.3d at 691). Likewise, the corroborating evidence need
not directly link the accused to the offense. Castillo, 221 S.W.3d at 691. 
Circumstances that appear insignificant may constitute sufficient evidence of
corroboration. Malone, 253 S.W.3d at 257. Likewise, though "mere presence" is
insufficient corroboration, evidence that the accused was at or near the scene when
or about when it was committed may sufficiently tend to connect the accused to the
crime, provided the evidence is "coupled with other suspicious circumstances." Id. 

 Because each case must rest on its own facts, corroboration does not require
a set quantum of proof. Id. The single requirement is that "some" non-accomplice
evidence, on which rational jurors could properly rely, see id., tends to connect the
accused to the commission of the offense, Long, 245 S.W.3d at 568-69 (citing
Castillo, 221 S.W.3d at 691). For appellant's criminal-solicitation conviction, this
requirement applies to evidence of the solicitation itself and to evidence of the intent
of the accused that the person solicited act. See Richardson, 700 S.W.2d at 594;
Claxton, 124 S.W.3d at 765. 

B. Attempt to Commit Capital Murder by Employing Another

 In challenging his conviction in Cause No. 01-07-01016-CR for the offense of
attempting to commit capital murder by employing another to commit murder for
remuneration, appellant contends that the jury relied solely on the testimony of the
accomplice witness Castillo, and that there is no evidence that corroborates Castillo's
testimony. We disagree. 

 The trial court's charge to the jury for this offense instructed the jury that
Castillo was an accomplice and tracked the corroboration requirements of article
38.14. Apart from Castillo's accomplice testimony, the jury heard evidence from
Zubarik, whom appellant summoned twice from Dallas to Houston within three
weeks for what appellant described as business meetings, but which Zubarik recalled
as meaningless, given that they neither discussed nor decided any business. Zubarik
dismissed, as a joke, the April 19 dinner with appellant, after which the plan to kill
him failed to go forward. Despite the lack of business discussion, the April 19 dinner
lasted 90 minutes, and Zubarik remembered that appellant insisted that Zubarik
remain to have dessert. Though circumstantial, this evidence had more significance
after the attempted murder on May 2, after an equally nonproductive meeting, during
which appellant again insisted that Zubarik remain to have dessert. 

 Zubarik also questioned the purpose of the May 2 dinner, after which the
attempted murder took place, because there was no attempt to accomplish any
business, despite the presence of other, "trucking" people with whom future business
was apparently contemplated. In addition, appellant excused himself from the group
during the dinner. After the attempt on his life, Zubarik also recalled that appellant
had appeared at the Mobil gas station within minutes, despite Zubarik's having
provided few details and no address about his location and despite appellant's trial
testimony that he had stopped at several stations looking for Zubarik's car. See
Malone, 253 S.W.3d at 251 (noting that proximity can corroborate when other
circumstances also present). Zubarik also recalled that appellant appeared so pale
that Zubarik feared appellant might faint and fall on him. There is also Zubarik's
wife's testimony that appellant had approached her, after escorting her and her friend
to the hospital where emergency personnel had transported Zubarik. While
cautioning her that police would want to interview her, appellant said that it would
be better that she not mention the million-dollar insurance policy that appellant
owned on her husband's life. 

 Considering the combined weight of the non-accomplice evidence, we hold
that the State met its burden to provide some evidence that tended to connect
appellant with the attempted murder of Zubarik on May 2, 2005, separate and apart
from Castillo's testimony, and therefore hold that sufficient evidence corroborates
Castillo's testimony, as required by article 38.14. 

C. Criminal Solicitation, Cause No. 01-07-01018-CR. 

 Appellant further contends that the jury relied solely on Castillo's accomplice-witness testimony in convicting him of solicitation of capital murder. Here, too,
appellant contends that the jury relied solely on the testimony of Castillo, and that the
State did not corroborate that testimony, as required by article 38.14 and section
15.03 the Penal Code. Again, we disagree. As stated above, corroborating evidence
for the offense of solicitation of capital murder had to connect appellant not only to
the solicitation itself, but also to his intent. E.g., Claxton, 124 S.W.3d at 765. 
Viewed in light that favors the jury's verdict, see Brown, 270 S.W.3d at 567, the
evidence corroborates both elements. 

 Appellant annually spent an additional $20,000 of funds of the financially
troubled company to purchase an additional $2 million life-insurance policy on
Zubarik's life. But he never informed Zubarik about the extra policy. Appellant
discredits this evidence as common practice among businesses owners. But, this does
not explain why appellant never told Zubarik that he had acquired the new policy, or
why appellant cautioned Zubiarik's wife not to mention life insurance to the officers
investigating the April 19 attempted murder of her husband. 

 Appellant also dismisses his unproductive business dinners with Zubarik on
both April 19 and May 2, 2005 as evidence of corrobration. Beyond suggesting that
the colleague whom he blamed for the offenses might have overhead the
conversations arranging the dinner meetings with Zubarik and then told Castillo,
appellant could not explain how Castillo knew that Zubarik would be coming from
Dallas to Houston for the two dinner meetings with appellant. 

 Appellant's prompt appearance at the imprecisely identified gas station after
the attempted murder is circumstantial evidence that tends to show appellant was
informed of Zubariks' location at the time of the shooting by the shooter or someone
in contact with the shooter.

 Appellant's repeated attempts to entice Zubarik to the Dallas warehouse further
corroborate Castillo's accomplice testimony, both as to appellant's intent to solicit
Zubarik's murder and as to the solicitation itself. Of the five telephone calls that
appellant made to Zubarik about the alleged need for Zubarik to be at the Dallas
warehouse to sign documents for an audit by the Internal Revenue Service, police
officers recorded two of those calls. It is apparent from the record that appellant
became very angry when Zubarik refused appellant's requests. As the record also
shows, despite appellant's references to a document or documents that required
Zubarik's signature, the package sent to the Dallas warehouse contained only a CD. 
Finally, the truck used to transport both the persons who confessed to participating
in the offense and the gun and money that police recovered at the scene was
registered to appellant. 

 We hold that the State met its burden to provide some evidence, separate and
apart from Castillo's testimony, that tended to connect appellant with criminal
solicitation to murder Zubarik, both as to appellant's intent and as to the solicitation
itself. We therefore hold that sufficient evidence corroborates Castillo's accomplice-witness testimony. 

 We overrule appellant's first point of error. 

Prosecutorial Misconduct through Leading and Badgering Questions


 In his second and third points of error, appellant challenges questioning and
conduct by the prosecutor, as well as the trial court's exercise of its discretion in
ruling on appellant's objections. According to appellant, the prosecutor used leading
questions, made sidebar remarks, and badgered witnesses to the degree that his
conducted amounted to "prosecutorial misconduct [that] inflamed and prejudiced the
minds of the jury." 

A. "Leading Questions"

 A leading question either suggests the answer sought by the interrogator or puts
words into the mouth of the witness to be "echoed back" in reply. Mega Child Care,
Inc. v. Tex. Dep't of Protective & Reg. Servs., 29 S.W.3d 303, 307 (Tex.
App.--Houston [14th Dist.] 2000, no pet.) (citing Myers v. State, 781 S.W.2d 730,
733 (Tex. App.--Fort Worth 1989, pet. ref'd)). 

 1. Standard of Review

 Rule 611(c) proscribes leading questions on direct examination "except as may
be necessary to develop the testimony of the witness." Tex. R. Evid. 611(c); Mega
Child Care, Inc., 29 S.W.3d at 307 (citing Tex. R. Evid. 611(c)). Rule 611 thus
continues well-settled law recognizing the "sound discretion" vested in trial courts
to permit leading questions. See Wyatt v. State, 23 S.W.3d 18, 28 (Tex. Crim. App.
2000); Mega Child Care, Inc., 29 S.W.3d at 308. To establish that the trial court
abused its discretion, appellant must demonstrate that the claimed leading questions
resulted in undue prejudice. See Wyatt, 23 S.W.3d at 28. It is essential that appellant
have preserved error through a timely request that the trial court refused. See Young
v. State, 137 S.W.3d 65, 69 & n.5 (Tex. Crim. App. 2004) (quoting text of Tex. R.
App. P. 33.1(a)). Even if we conclude that the trial court erred, this Court may not
reverse unless we conclude, from the record as a whole, that the error affected a
substantial right of the appellant. James v. State, 264 S.W.3d 215, 222 (Tex.
App.--Houston [1st Dist.] 2008, pet. ref'd) (citing Tex. R. App. P. 44.2(b)). Error
affects a substantial right of an accused when it had a substantial and injurious effect
or influence on the jury in determining its verdict. Id. (citing Johnson v. State, 43
S.W.3d 1, 3-4 (Tex. Crim. App. 2001)). 

 When the trial court has sustained an appellant's objection and has instructed
the jury to disregard, however, the instruction to disregard will generally cure any
error, because we presume that the jury complied with the instruction. See Bermudez
v. State, 504 S.W.2d 868, 871 (Tex. Crim. App. 1974). Finally, an erroneous
evidentiary ruling is harmless when other evidence on the same matter is admitted
without objection from appellant. James, 264 S.W.3d at 222 (citing Saldano v. State,
232 S.W.3d 77, 102 (Tex. Crim. App. 2007); Leday v. State, 983 S.W.2d 713, 717-18
(Tex. Crim. App. 1998)).

C. Discussion

 1. Questions that Appellant Claims the Jury Could Not Disregard

 Appellant acknowledges that an instruction by the trial court to disregard will
cure most error that arises from a leading question. See Bermudez, 504 S.W.2d at 
871. Appellant contends, however, that two questions by the prosecutor exceeded the
bounds of that general rule and thus constitute exceptions to it that warrant reversal. 
We disagree.

 The first of these questions occurred when the prosecutor questioned Officer
F. Quinn, whom the undercover informant approached in November 2006 after he had
been conscripted to murder someone for a $2,000 down payment and $15,000 payoff. 
Officer Quinn had just completed testimony in which he described the information
he obtained about Castillo through the undercover informant. Specifically, Quinn
learned that Castillo worked for Genesis, that the photograph on his driver's license
depicted him in his Genesis uniform, and that he lived in a working-class area, all of
which, Quinn testified, gave the informant's earlier information "a lot of credibility." 
At that point, the prosecutor asked the following question: 

 Did it seem strange to you that someone who appeared to be a working
man, whose actual driver's license [showed him] in his uniform, lived
in a lower/middle class part of town, would have all this money to hire
someone to kill somebody?


 When appellant objected on the grounds that the question was leading, the trial
court instructed the prosecutor not to lead. When Quinn replied nonetheless, "It
seemed a little strange," the trial court, prompted by appellant's counsel, instructed
Officer Quinn to wait for the next question. Appellant's counsel then asked that the
jury be instructed to disregard the inadvertent answer, and the trial court complied. 
The prosecutor attempted, through two additional questions of Officer Quinn, to ask
whether he was concerned about what he learned about Castillo and what those
concerns were. The trial court sustained objections to both of these questions. 

 Appellant contends on appeal that the trial court's instruction to disregard did
not cure the harm from the prosecutor's "Did it seem strange . . ." question excerpted
above. Yet, appellant did not object to the next question the prosecutor posed to
Quinn, ". . . Are [sic] you concerned there is [sic] more people involved in this plot
than just Argueta and Castillo?" Likewise, appellant did not object to Quinn's
response, "Yes, sir." The prosecutor thus elicited, without objection, a response from
Officer Quinn that was similar to the response that the trial court had just instructed
the jury to disregard, but provided even more information than the answer that the
trial court had struck. Accordingly, any error arising from Officer Quinn's initial
answer or from the trial court's ruling is harmless. See James, 264 S.W.3d at 222.

 A similar analysis applies to the second question, also posed to Officer Quinn,
that appellant contends was so harmful that the trial court's instruction to disregard
failed to cure the resulting prejudice to appellant. The question occurred during the
prosecutor's redirect examination, after Quinn stated that he did not have enough
information to charge the undercover informant Wade, but that he would not have
hesitated to pursue indictments had there been sufficient information. The prosecutor
then asked Officer Quinn,

 Counsel has indicated or asked you whether there is any physical
evidence linking his client to the April 19th or May 2nd evidence. Is
there one single shred of evidence linking Celso Castillo, George
Argueta or Adrian Beltran to either of those incidents? We're talking
about seven indictments there.


Officer Quinn replied that there was none and then replied "Yes, sir, they did," when 
the prosecutor asked if they had confessed, and "No, sir." when the prosecutor asked,
"So, there is no physical evidence against them, either?" The next question by the
prosecutor resulted in incurable harm, according to appellant, even though Officer
Quinn did not reply. The question was, "They're [sic] conscience[s] compelled them
to confess?" 

 Here, again, the trial court sustained appellant's objection that the prosecutor's
question was leading and then instructed the jury to disregard the question. Here too,
however, appellant did not object to the following question by the prosecutor: "Well,
let me ask you this: Is playing on someone's conscience one of the techniques that
you and your people use in interviewing suspects?" Likewise, there was no objection
to Quinn's reply, in which he stated, 

 It is. And I think most people, when they get caught, they know it's
coming; so a lot of times their conscience does work on them and they
are ready. I think, deep down, they know one day it's coming and it's
going to catch up with them. They know. 


 The prosecutor thus posed, without any objection, a question that, in addition,
elicited a response from Officer Quinn, again without objection, that likely provided
more information than Quinn might have provided in response to the earlier question
that appellant contends was incurably harmful. Under these circumstances, the earlier
question that appellant challenges was rendered harmless. See James, 264 S.W.3d
at 222.

 2. Waived Complaints

 Appellant also complains about questions by the prosecutor to which appellant
objected and the trial court sustained objections, but to which appellant concedes he
did not request that the jury be instructed to disregard. Appellant complains on
appeal that the prosecutor continued to use leading questions on direct examination
after having been previously admonished not to lead the State's witnesses. 
Appellant's complaint encompasses eight questions posed by the prosecutor. The
prosecutor posed the questions to Quinn, Castillo, and Zubarik. 

 The "traditional and preferred procedure" for preservation of error requires that
the complaining party object when it is possible, to request an instruction to disregard
if the prejudicial event has occurred, and to move for a mistrial for error that an
instruction to disregard would not cure. Though this actual sequence is not essential,
"a timely, specific request that the trial court refuses" is essential. Young, 137 S.W.3d
at 69 & n.5 (quoting text of Tex. R. App. P. 33.1(a)). 

 Appellant defends not pursuing his objections to the eight questions he
enumerates to an adverse ruling on the grounds of not wanting to "sound redundant
and further frustrate an already frustrated jury by continuously asking for instructions
for the jury to disregard." In response, the State disputes that the questions qualified
as leading and argues that the substance of the questions either repeated or clarified
evidence already presented through other witnesses. See Newsome v. State, 829
S.W.2d 260, 270 (Tex. App.--Dallas 1992, pet. ref'd). The State alternatively
contends that appellant has not established that the prosecutor's questions inflamed
the jury or explained how the questions prejudiced appellant and, lastly, that appellant
did not preserve his complaint. 

 Though the record of this case reflects a highly contentious trial, the trial court
moved swiftly through objections by both sides and ruled promptly and efficiently. 
The trial court's instructions to discontinue leading questions were likewise delivered
promptly and efficiently. We therefore conclude that appellant's failure to pursue his
complaints to an adverse ruling is dispositive, and we hold that appellant waived any
error. See Tex. R. App. P.33.1(a); Young, 137 S.W.3d at 69. 

 3. Overruled Objections

 Appellant next contends that the trial court abused its discretion by overruling
appellant's objections to six questions that appellant contends were impermissibly
leading. The prosecutor posed five of these questions to Castillo and the last question
to Officer Powell. Having reviewed the record in the context of these questions and
the trial court's ruling, we cannot say that the trial court abused its discretion. See
Wyatt, 23 S.W.3d at 28. Though each of these questions elicited a "yes" or "no"
answer, none of the questions suggested an answer that the prosecutor expected or put
words into the mouth of the witness to be repeated in the reply. See Mega Child
Care, Inc., 29 S.W.3d at 307. 

 We overrule the portions of appellant's second and third points of error that
challenge questions by the prosecutor that appellant contends were impermissibly
leading.

Prosecutorial Misconduct


 Appellant further contends, in his second point of error, that the cumulative
effect of sidebar remarks, badgering, and improper jury argument by the prosecutor
resulted in sufficient prejudice to warrant reversal. 

A. Standard of Review

 Claims of misconduct arising from inappropriate remarks by the prosecutor will
not constitute reversible error unless, in light of the record as a whole, the remarks or
arguments are extreme or manifestly improper, violate a mandatory statute, or inject
new facts harmful to the accused into the trial proceeding. See Wesbrook v. State, 29
S.W.3d 103, 115 (Tex. Crim. App. 2000). To rise to this level, we must be convinced
that the remarks represented a willful and calculated effort on the part of the State to
deprive appellant of a fair and impartial trial. Id. In most instances, an instruction
to the jury to disregard, which we may presume that the jury followed, will cure error
from an improper remark. Id. Only offensive or flagrant error will warrant reversal
when the trial court has instructed the jury to disregard. Id. at 116. 

B. Discussion

 Again grouping his complaints, appellant complains of eight different remarks. 
Six remarks involve questions by the prosecutor; the remaining two concern
comments by the prosecutor during jury argument. 

 1. Questions

 At the beginning of his cross-examination of Officer P. Powell, the prosecutor
began his first question as follows: "I want to separate out what somebody says as
fact--." Appellant interrupted the question to object "to the side-bar." The trial court
sustained the objection, and instructed the prosecutor to "Just ask the questions." 
When the prosecutor replied that he intended no side-bar, the trial court promptly
instructed the jury to disregard the prosecutor's response--without appellant's having
objected or requested that relief. There was no further discussion, and the prosecutor
proceeded to his next question. Given that the trial court swiftly instructed the jury
to disregard, on the court's own motion, we presume that the jury followed that
instruction. See Wesbrook, 29 S.W.3d at 116. The prosecutor's remark did not rise
to the level that the jury was incapable of disregarding it. 

 Regarding the five remaining questions by the prosecutor, the trial court
sustained objections to sidebar remarks for three questions, but appellant accepted
that relief and did not pursue his objections to an adverse ruling. Accordingly,
appellant did not preserve any error that may have arisen from the remarks. See Tex.
R. App. P. 33.1(a). Regarding the remaining two questions, the trial court sustained
objections to the prosecutor's phrasing, after which the prosecutor chose different
words to ask the questions. Here, too, appellant did not preserve error because he did
not pursue his objection to an adverse ruling. See id. On reviewing the record, we
are not convinced that the prosecutor's remarks show a willful and calculated effort
on the part of the State to deprive appellant of a fair and impartial trial. See
Wesbrook, 29 S.W.3d at 115.. 

 2. Jury Argument

 Appellant next complains about two remarks by the prosecutor during rebuttal
arguments to the jury at the guilt-innocence stage of the trial. Appellant argues that
the prosecutor's remarks were so prejudicial that the trial court's instruction that the
jury disregard could not have cured the harm that arose from them. 

 Contested jury argument must be extreme or manifestly improper to constitute
reversible error. Sandoval v. State, 52 S.W.3d 851, 857 (Tex. App.--Houston [1st
Dist.] 2001, pet. ref'd). "In general, proper jury argument encompasses one of the
following: (1) summation of the evidence presented at trial; (2) reasonable
deductions drawn from that evidence; (3) answers to the opposing counsel's
argument; and (4) pleas for law enforcement." Id.; Guidry v. State, 9 S.W.3d 133,
154 (Tex. Crim. App. 1999). In most cases, if error occurs, an instruction to disregard
will cure any error committed. Shannon v. State, 8942 S.W.2d 591, 597 (Tex. Crim.
App. 1996); Cole v. State, 194 S.W.3d 538, 544 (Tex. App.--Houston [1st Dist]
2006, pet. ref'd). 

 Improper jury argument does not result in reversible error that warrants a
mistrial unless the trial court's instruction to disregard would not cure any resulting
harm. Lucero v. State, 246 S.W.3d 86, 101 (Tex. Crim. App. 2008). Harm from
improper jury argument is incurable if the argument (1) is extreme, improper, injects
new and harmful facts into the case, or violates a mandatory statutory provision and
(2) as a result, is so inflammatory that its prejudicial effect cannot reasonably be
cured by an instruction to disregard. Thompson v. State, 89 S.W.3d 843, 851 (Tex.
App.--Houston [1st Dist] 2002, no pet.) (citing Long v. State, 823 S.W.2d 259, 267
(Tex. Crim. App. 1991); Logan v. State, 698 S.W.2d 680, 682 (Tex. Crim. App.
1985)). 

 The remarks occurred just before the prosecutor concluded his argument. In
each instance, the prosecutor's final remark was a request that the jurors "trust" him. 
In the first instance, the prosecutor argued, 

 Now, Gregulak is based in Chicago till he gets caught stealing, and the
defendant relocates him to Dallas. What connection does he have to the
three other plotters that he all of a sudden shows up at a Whataburger
with a gun and $15,000? What is the link? What is the link between
Gregulak and the other three? The link is right there. There is no other
link. He's the only plotter. Again, trust me.


(Emphasis added.) The trial court sustained appellant's objection, instructed the jury
to disregard, but denied appellant's request for a mistrial. Continuing his final
summation, first by discrediting appellant's defensive theory and then emphasizing
appellant's culpability through the telephone calls he made to Zubarik, the prosecutor
then stated, 

 . . . Is the defendant guilty? Of course he is. Folks, I ask you for no
more, but no less, than [Zubarik and his wife] deserve. They've been
waiting a long two years. I ask you for justice, for a swift and justified
verdict of guilty. Trust me.


(Emphasis added.) Once again, the trial court sustained appellant's objection,
instructed the jury to disregard, but denied appellant's request for a mistrial. (5) 

 In Thompson v. State, a panel of this Court concluded that the prosecutor's
request that jurors "trust" him was not a request for law enforcement, as the State
contended, but harmful error that affected the defendant's substantial rights and
required reversal for a new punishment hearing. 89 S.W.3d at 853-54 (citing Tex. R.
App. P.44.2(a) (constitutional error standard)). We distinguish Thompson, in which
the prosecutor's remark occurred in the following context: 

 Ladies and gentlemen, there's something important that I cannot tell you
about concerning why you should not give [appellant] anything less than
ten years. There's a very important reason[,] but legally I'm not allowed
to tell you what it is[,] but it is very important. Trust me on this. If you
give [appellant] less than ten years, you will find out later what's going
to happen. 


89 S.W.3d at 850 (emphasis added). 

 In Thompson, the prosecutor's argument asked the jury to speculate about a
"'very important'" matter; the jury had no idea what this important matter was, but was
nonetheless asked to "trust" the prosecutor that it existed and, for that reason, to assess
a minimum of ten years' punishment. Id. at 851. This was not only egregiously
improper, but also rendered the jury's task of applying the law to the facts "especially
difficult." Id. at 854. 

 In this case, by contrast, the prosecutor did not use the words "Trust me" to refer
to matters that were outside the record or unknown to the jurors; likewise, the
prosecutor did not ask the jurors to speculate about unknown matters. See id. at
851-52. The words were not extreme or improper and did not inject new and harmful
facts or violate a mandatory statutory provision. See id. at 851. On the record before
us, the words appear to be a rhetorical device repeated by the prosecutor to emphasize
the State's interpretation of the evidence developed at trial. To the extent that the
words, "Trust me," can be construed as the prosecutor's improperly attempting to
testify--by vouching to the truth through his arguments--by sustaining appellant's
objection and promptly instructing the jury to disregard, the trial court cured any
resulting harm. See Lucero, 246 S.W.3d at 101. We therefore hold that the
prosecutor's "Trust me" remark was not so inflammatory that its prejudicial effect
required a mistrial. See id.; Thompson, 89 S.W.3d at 851. 

 We overrule the remaining portions of appellant's second point of error.


 Conclusion 

 We affirm the judgments of the trial court.

 


 Sherry Radack

 Chief Justice

 

Panel consists of Chief Justice Radack and Justices Alcala and Hanks.


Do not publish. Tex. R. App. P. 47.2(b).

1. This Court has previously held that the trial court did not abuse its discretion by
setting appellant's bond. See Cooley v. State, 232 S.W.3d 228 (Tex. App.--Houston
[1st Dist.] 2007, no pet.). 
2. The record reflects that the initial purpose of these policies was to provide cash to the
survivor to purchase the stock of the decedent from the survivor's spouse. At some
point, the policies featured in a proposed "buy-sell" plan proposed by appellant. 
3. The request to Zubarik was not simply to "sign for a package," as appellant contends,
but to sign a document and to examine some financial information.
4. "A person commits the offense of criminal solicitation if, with intent that a capital
felony or felony in the first degree be committed, he requests, commands, or attempts
to induce another to engage in specific conduct that, under the circumstances
surrounding his conduct as the actor believes them to be, would constitute the felony
or make the other a party to its commission."


 Tex. Penal Code Ann. § 15.03(a) (Vernon 2003).

5. Appellant complains of two instances of the words "Trust me" by the prosecutor. But
the prosecutor had already used the words once before in final summation, when he
referred to appellant's infidelity, but assured the jurors, through the phrase, "Trust
me," that he meant only to show how desperate appellant had become as a result of
his financial difficulties. Appellant did not object to the words at that time.